## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JANE DOE,** | § | |
| | § | |
| *Plaintiff,* | § | **C.A. No. 4:17-cv-1957** |
| | § | |
| **V.** | § | |
| | § | |
| **PRAIRIE VIEW A&M** | § | |
| **UNIVERSITY** | § | |
| | § | **(JURY TRIAL DEMANDED)** |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Jane Doe,[1] filing her Original Complaint against Defendant Prairie View A&M University (hereinafter "Prairie View University" or "the University"), and in support thereof would show as follows:

### I.    Preliminary Statement

This is a lawsuit charging Defendant Prairie View University with intentionally subjecting Plaintiff to a sexually charged atmosphere wherein she faced sex discrimination, sexual harassment, sexual assault and retaliation for attempting to resist same. This lawsuit further speaks to Defendant's deliberate indifference and retaliation

---

[1] "Jane Doe" has been substituted for the Plaintiff's name for all causes of action brought through this Complaint which would otherwise publish important privacy interests of all parties.  Plaintiff fears for her personal safety as well as that of her family as a result of this Complaint. Since complaining to the University about the sexual harassment set forth in this Complaint, Plaintiff has received threats and has been harassed.  Fairly applying this concern, the Complaint does not use the Plaintiff's supervisors' names but identifies them by their initials only.  Upon consultation with counsel for the Defendant, Plaintiff will file a Motion to Proceed with Fictitious Names.

in response to Plaintiff's complaints of sex discrimination, sex harassment, sexual assault and retaliation.

Plaintiff's lawsuit describes Defendant's failure to promptly and appropriately investigate and respond to her complaints and it highlights Defendant's mindset concerning its female students, like Plaintiff, who are subjected to sex discrimination and harassment and report same.  Rather than address the unlawful discrimination and harassment, Prairie View University turned a blind eye to Plaintiff's experience leaving her to fend for herself.

Defendant's mindset and failures promotes an environment where students' chances of being sexually discriminated against, harassed, assaulted, and/or retaliated against for standing up against such unlawful conduct substantially increases.

Moreover, Defendant's failure to promptly and appropriately investigate and respond to Plaintiff's complaints fostered a hostile, retaliatory environment for Plaintiff, effectively denying Plaintiff access to educational opportunities for which she has paid for and aspired toward her entire life.

This action alleges violations of Title IX and, thereunder, Cleary Act violations and violations of Section 1983.  This action also alleges a pendent claim arising under state law for negligence. In support thereof, Plaintiff would show the Court as follows:

## II.    Jurisdiction, Parties and Venue

1.      This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to 28 U.S.C. §§ 1331 and 1343.

2

2.      Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a). This action is also brought pursuant to 42 U.S.C. §1983; 42 U.S.C. §1988, and the Fourth amendment to the U.S. Constitution (made applicable to Defendant through the Fourteenth amendment to the U.S. Constitution).

3.      Venue is proper in this district pursuant to 28 U.S. C. §1391(b), because all Parties reside in this district and the events giving rise and the employment practices alleged to be unlawful herein were committed within the Southern District of Texas, Houston Division.

4.      Plaintiff Jane Doe is a female.  At all material times Jane Doe was living in Harris County, Texas.  At the time of events complained of herein, Jane Doe was a student attending Prairie View A&M University.

5.      Defendant Prairie View University is an educational institution located in Waller County, Texas.  Prairie View University may be served through its President: George C. Wright.

6.      During all material times, Prairie View University received federal funding for its academic programs and activities as contemplated by Title IX, 20 U.S.C. 1681, *et seq.* for its activities including financial aid and research grants amount other sources.

### III.      FACTS

7.      Jane Doe (female) is currently 22 years old.  She is the mother of one young child who is currently 4 years old.

8.      Jane applied and was accepted into Prairie View University in the fall of 2012 as an engineering student-major.  Jane, however, waited until the spring of 2013 to enroll into the University due to the birth of her daughter in 2012.

9.      In the spring of 2013, Jane started her college education at Prairie View University paying for tuition through scholarships and other forms of financial aid assistance.

10.     Jane's lawsuit claims are based on events occurring during her third year at the University; Jane was 20 years old at that time.

**Jane meets PJ at an off-campus event.**

11.     On October 3, 2015, during Jane's junior year, Jane attended an off-campus social event/banquet—unrelated to the University or its functions—with her aunt. During the event, Jane and her aunt were introduced to a man named PJ. PJ was extremely friendly to Jane and even asked if she wanted to dance with him.  Jane declined.

12.     Toward the end of the banquet, PJ invited Jane and her aunt to go back stage and take photos with the artists who had performed that evening. Jane and her aunt accepted PJ's invitation.

13.     Afterwards, PJ told Jane, "take my number down, I would love to keep in contact with you ladies." Jane entered PJ's phone number in her aunt's cellular phone not her own.

14.     A few days after the banquet, PJ telephoned the number that Jane had

provided to him but instead of reaching Jane, PJ reached Jane's aunt. During their telephone call, PJ told Jane's aunt that he worked at Prairie View University. Naturally, Jane's aunt mentioned in response that, Jane, her niece attended the University as a student.

15.     PJ also told Jane's aunt that he had a position available at the University to hire a student. PJ asked Jane's aunt to let Jane know about the employment opportunity.

16.     At that time, Jane was unemployed and desperately searching for an on-campus student position, so she was very excited when her aunt shared the news about a possible employment opportunity at the University.

17.     To Jane's surprise, on October 7, 2015, PJ went a step further and sent her a Facebook friend request. Through Facebook, PJ asked Jane to come by his office in the College of Agricultural & Research Center.

18.     Interested in the potential job, Jane reported to PJ's office on October 12, 2015 and met with PJ for about an hour and a half.

19.     During the meeting, PJ told Jane that the job required some technical background and that it would be a great opportunity for Jane because she was an engineering student-major. PJ provided Jane with the position number of the job to apply for it online and told her it was a job under the Capacity Building Grant funded by the United States Department of Agriculture and the National Institute of Food Agriculture.

20.     During the meeting, PJ also complimented Jane several times, told her that she was beautiful and that he would love for her to work with him.  Before Jane left the meeting, PJ told Jane that the job was hers if she wanted it.

21.     In line with PJ's instructions, Jane applied for the job using the position number PJ provided, turned in her paperwork and was given a start date of Monday, November 9, 2015 to begin working as PJ promised.

## Using federal funds, PJ gets Jane a job at the University

22.     On November 9, 2015, Jane started her job with PJ at the University. During her very first week of employment, PJ told Jane that it was an easy job and that all she had to do to maintain it was to do what he asked of her, which he described as "satisfying him and making him happy."

23.     Later that same day, while Jane was in PJ's office, two men entered and, upon seeing Jane, one of the men exclaimed, "Oh, nice PJ!  I am going to have to borrow her."  PJ replied, "No, no she's mine, get your own."  The man replied, "It's okay; we can all take turns." The three men burst into laughter.

24.     Jane excused herself and walked out of PJ's office. While waiting in the hallway for the men to leave, Jane heard one of the men ask PJ, "Are you hitting that?" And, PJ reply, "No, not *yet*."  The man replied, "goddam, that's a nice piece of ass you got all to yourself."

25.     Jane was shocked. She felt degraded and objectified by the men but never thought that PJ would really try to cross any lines with her, physically. Additionally, she

desperately needed the job to help support her daughter (whom she had recently regained custody of), so Jane determined to continue working for PJ.

26.     Initially, Jane was right.  The first two days of work, PJ was extremely nice to Jane and seemed to extend himself to Jane in an effort to gain her trust.  PJ would tell Jane that she could confide in him about anything. In turn, Jane would often vent to PJ about school and how much she missed her home state of New York and her family there. Jane also confided in PJ about the not-so-distant domestic abuse she suffered at the hands of her daughter's father.

**The unwanted touching begins/sex discrimination**

27.     By the end of the first week, PJ started hugging Jane when she arrived to work. He started by only hugging Jane around her waist. PJ then progressed to fondling Jane's buttocks when he hugged her.

28.     When this unwanted touching began to occur, Jane felt trapped, conflicted, and outraged. She believed that she was indebted to PJ because he had given her a job that she so desperately needed but she also felt outraged that PJ would place her in such a tenuous and undesirable position.

29.     Confused, conflicted and distraught, Jane did not immediately verbally object to PJ's *hugs*.  Instead, she stayed silent but stiff in fear of losing her job.

30.     By the second week of work, PJ started telling Jane things like: "God put me in your life for a reason" and that she could only understand what he wanted from her if she were on a higher intellectual level. In other words, PJ tried to manipulate Jane

into silence.

31.     And Jane did indeed stay silent. She needed her job, and knew that PJ could take it from her as easily as he had given it to her -- he had made that clear during the very first week of Jane's employment.

**Sexual Assault**

32.     On Tuesday November 17, 2015, when Jane reported to work at PJ's office, PJ closed and locked the door behind her. When Jane sat down in a seat facing PJ's desk, PJ said, "I can't have a hug?"

33.     Jane needed her job and felt compelled to comply, so she allowed PJ to hug her but when Jane proceeded to sit back in the seat where she had initially been seated, PJ signaled her to a chair next to his.

34.     When Jane sat down, PJ placed Jane's hand on his penis, which was erect. PJ then said, "It doesn't bite" and stood up in front of Jane. PJ then pulled out his penis and began touching himself.

35.     Jane sat in silence and fear and looked out the window, which was in the direction opposite to PJ. Unbothered, PJ grabbed Jane's chin and turned Jane's head to face him positioning his penis in her face.

36.     He told Jane "it's simple all you have to do is open your mouth." Jane did not want to perform oral sex on PJ but then he put the tip of his penis on Jane's mouth and Jane knew he wouldn't let her leave until she did.

37.     Jane opened her mouth and PJ pushed his penis inside of it. When it was

over, Jane left his office, went to the restroom and sobbed in humiliation of what had happened.

38.     Jane didn't report to work for the remainder of the week but returned to work on Monday, November 23, 2015.

39.     When Jane reported to work, PJ greeted Jane with a hug and asked Jane about her weekend. Jane responded that it was okay, and PJ replied, "You were amazing!" (apparently referring to the event that took place the week before).

40.     Humiliated, Jane got up and ran to the computer lab in tears. Approximately ten minutes later, PJ found Jane and asked her if she was okay. When Jane replied, no; he told Jane to come back to his office and talk to him.

41.     In PJ's office, PJ told Jane that she was like a ***daughter*** to him and that she could talk to him about anything that was bothering her. Emotionally distraught and humiliated, Jane remained quiet.

42.     Thereafter, Jane continued to report to work but PJ's harassment and assault had completely overwhelmed and consumed her.   Jane found herself sporadically crying. She also started to gain excessive weight, and she found it difficult to concentrate in her classes.

43.     PJ did not force Jane to engage in oral sex again but he would grab Jane's buttocks, touch her breasts and touch Jane in other inappropriate ways.  He would also make Jane touch him by grabbing Jane's hand and forcing her to touch him in inappropriate sexual ways.

44.     PJ would also show Jane sexual pictures and videos on his MAC computer. When he would touch Jane, he would say things like, "I'll wait until you're ready to give up that fat young pussy."

45.     PJ would also tell Jane about his personal sexual fantasies and past sexual experiences each time she reported to work. PJ specifically expressed his infatuation with the innocence of young woman and boasted that his wife was 20 years younger than him.

46.     PJ would tell Jane about sexual things he wanted Jane to do to him and about different women who had given him oral sex.  On one occasion PJ even told Jane about another student worker who he had sexual fantasies about. He also admitted that he had reported that same student to an administrative assistant for her attire because of the sexual fantasies he was having about the student. PJ also admitted that, after his complaint, he returned to his office to relieve himself (sexually).

47.     These are the kind of discussions and conduct Jane was forced to endure while working with PJ at the University.  This is not what Jane expected to have to endure for a job at Prairie View University.

**PJ's winter-break plans**.

48.     By this time, the semester was ending and winter break was approaching. PJ told Jane that he wanted Jane to work with him during winter break because most faculty, staff and students would be out on break.  He told Jane that, with the faculty and students away, he would have an opportunity to be alone with Jane to have **sex**

10

with her.

49.     In response, Jane began looking for excuses to avoid working during the break.  She told PJ that at the last minute her grandparents had surprised her with tickets to NYC to visit them and that she wouldn't be able to work after all. This was not true.

50.     PJ didn't get upset with Jane because he too found out that he would not be available during winter break because his brother in Jamaica had died, and he needed to go to Jamaica to bury him.

51.     As such, Jane and PJ had no interactions during winter break.

**Spring Semester with PJ**

52.     When school resumed and the spring semester began, the same sexually inappropriate behaviors from PJ continued.

53.     Around this same time, Jane had met a graduate student who was interested in her. At times, Jane would ask her male friend to walk with her to her job so that PJ would think she was in a relationship and would, hopefully, stop sexually harassing her.

54.     (Naïvely) Jane believed that if PJ saw (or thought) that she was seeing someone, he would stop his sexual requests and behaviors but he didn't; in fact, it only made the situation worse.

55.     On a few occasions, after seeing Jane with her male friend, PJ would pin Jane against the wall with her back facing him and whisper in her ear "Are you fucking him?" "All he wants from you is sex, and once he gets what he wants he'll be done with

11

you." All while sliding his hand on her body.

56.     There were occasions when PJ even confronted Jane's male friend and told him that he was Jane's <u>boss</u> and Jane was <u>his</u> student worker. PJ even gave Jane's friend a spiel about his educational background when all Jane's friend was doing was walking Jane to work and/or dropping lunch off for Jane on occasion.

**<u>Jane breaks down</u>**

57.     During spring break Jane broke her leg and missed almost 2 weeks of work. During that time, PJ would call Jane and tell her that he missed her. He would also text Jane.

58.     By this time, however, Jane's spirit was broken and she was mentally and physically distraught. Jane had made it up in her mind that enough was enough and that she would no longer silently comply with PJ's sexual overtures.

59.     During this time, Jane was extremely emotional and many of her friends questioned her wellbeing.  Jane's graduate, male friend who had seen PJ in action knew something was not right and he asked Jane a few times what was going on with her boss. He also told Jane, "your boss likes you and he's too involved in your personal life and that's unprofessional."

60.     Jane knew that this was true but she was an emotional wreck. At random moments throughout the day she would start crying and, at other moments, she would simply be angry about what was going on and what PJ had put her through. She also worried frantically about her job and her financial wellbeing if PJ took it from her.

61.     For the first time ever, Jane was failing her classes at the University.

62.     Consequently, Jane made up her mind to tell PJ that he could not continue to use her for sexual favors and that she was emotionally distraught because of his conduct.

63.     When Jane told PJ, PJ became upset and told Jane that she could not keep working for him without making him happy!

64.     In line with his word, almost immediately PJ started to reduce Jane's work hours.

65.     On April 5, 2016 Jane decided to complain to "ER," PJ's immediate supervisor about her reduced hours. She told ER that PJ was being unprofessional toward her by reducing her hours without valid reason but Jane made no specific mention of the sexual harassment she had been enduring.

66.     In response to Jane's complaint, ER set up a meeting with Jane, himself and PJ, wherein PJ stated that he had no issues with Jane and that he would allow her to work if he had hours and/or work for her to do.

67.     After the meeting, however, Jane's work environment with PJ spiraled downhill fast and hard. PJ apparently believed that Jane had reported his sexual harassment and inappropriate sexual conduct to ER; but Jane had not yet done so.[2]

68.     Moreover, PJ did not want to work with Jane if he was not giving into his

---

[2] Early on when PJ started to sexually harass Jane, he made Jane promise not to tell anybody what happened between them. He also told her that if she ever did, nobody would believe Jane and no penalty would be brought against him because that's the way "PV" operates.

13

sexual requests.

69.     After the meeting between ER, PJ and Jane, PJ became openly hostile and rude toward Jane and continued to cut her hours. He subjected her to a hostile work environment.

70.     Jane determined that she would <u>have</u> to tell ER about the sexual harassment she had endured by PJ and the retaliation she was now facing because she would no longer acquiesce.

71.     On or about April 12, 2016, Jane reported to ER that PJ had subjected her to sexual harassment since she first started working with him and that she believed that PJ was cutting her hours because she had demanded that the sexual harassment and sexual touching stop.

72.     Jane told ER everything. She told him about PJ sexually touching her and that during her entire employment with PJ she believed that her job was in jeopardy if she didn't acquiesce to his sexual requests and talk.

73.     Jane told ER that since she had told PJ that she would not acquiesce, he had subjected her to a hostile work environment and retaliation.

74.     In response, ER asked Jane **<u>not</u>** to report PJ because "Jane would not want something like that on [her] conscience." He told Jane he wasn't surprised about the harassment however he was shocked that all of it took place in PJ's "tiny office," and then chuckled.

75.     ER told Jane that PJ had been a friend of his for about 20 years and that

he would talk to him about her hours. ER assured Jane that contrary to Jane being fearful about losing her job, she would not and that he would right PJ's wrongs by paying Jane out of his own pocket if it meant making the entire situation disappear.

76.     Unbelievably, he also told Jane, "You know what; I bet you really wish that PJ would bend you over his desk. It's okay, I will tell him just screw her before she makes our lives a living hell because that's what she really wants."

77.     Jane left ER's office dismayed.  While she genuinely hoped that things would improve, ER seemed to belittle her complaints of sexual harassment and retaliation.

78.     While she was not looking to jeopardize PJ, Jane wanted to be able to work and attend school in a harassment free environment and work her job without having her hours reduced and facing retaliation.

79.     However, even after the April 12th meeting, PJ's rude and retaliatory behavior toward her continued. PJ was simply in retaliation mode and he believed he was untouchable.  He continued to treat Jane in a hostile manner, and he continued to cut her work hours.

80.     Next, PJ hired a new student worker and told Jane she couldn't work there anymore because he didn't have any more funding in his USDA grant budget to employ her. This was simply not true.

81.     After PJ told Jane that she could not have any more hours, he then hired 2 more students from the College of Engineering for the summer and fall semesters of

2016.

82.    Jane reported the continued retaliation to ER and again ER again told Jane he had known PJ for almost 20 years, that PJ was a good man and that he (ER) would fix it.

83.    ER also told Jane that filing a report would not only negatively affect PJ but it would also affect the innocent members in PJ's family and ER attempted to persuade Jane that she would not want that on her conscious. Instead ER suggested that he set up another meeting with Jane, himself and PJ to discuss Jane's hours and employment.

84.    Although Jane agreed to another meeting, after the second group meeting, still nothing change. At this point Jane felt helpless. What is more, reporting the sexual harassment did nothing to stop the nightmare Jane was facing.

85.    Jane's entire school life was falling apart.  Jane decided to confide in her graduate school friend about some of what she was dealing with.

86.    Thankfully, Jane's friend told Jane that she should report everything.  He also directed her to the proper department to report her complaints.

87.    On that same day, May 19, 2016, Jane reported PJ's sexual harassment and unlawful sexual conduct to the University's EEO/Title IX office.

88.    Jane reported to the University's Title IX coordinator, that she had been sexually harassed and assaulted by PJ and that she was facing a hostile work environment and retaliation after asking PJ to stop.

89.     When Jane reported it to the University's Title IX coordinator, she was hesitant because she was scared of further retaliation, she was scared to betray PJ after promising not to report him and the harassment, and she was scared that no one would believe her like PJ had threatened.

90.     At 20-years old and lacking a lot of maturity and experience that an older person has acquired, Jane felt incessantly indebted to PJ because of the employment opportunity he had initially provided her. She also felt sympathetic that PJ had a son battling sickle cell anemia and a wife who often underwent operations.  Jane cared that PJ had a family that depended on him financially.

91.     However, during her report to the University's Title IX coordinator, Jane mentioned PJ's name and the Title IX coordinator responded, "PJ? Short, bald head with an accent." When Jane responded, "yes," the Title IX coordinator announced, "sadly, this isn't the first, second or third complaint I've received involving PJ. You see this file cabinet (she touched a tall beige file cabinet against the wall in her office), it's full of complaints reported at this University and somewhere in there is a folder with PJ's name on it."

92.     Confused, Jane responded "Why is he still here, why was he given another opportunity to violate someone else?" The Title IX coordinator said "Sadly, it happens all too often here at Prairie View, if it were up to me they would be out of here but it's not, unfortunately. My job is only to investigate the complaint, report and submit my findings for review at the Texas A&M systems office."

93.     Ultimately, the Title IX coordinator's prediction was correct.   The University did nothing about Jane's complaint for months.  Rather, Jane- now jobless – continued to suffer as a result of the sexual ordeals and misconduct that PJ had subjected her to.

94.     Jane did poorly in her classes and suffered through irreparable humiliation, embarrassment, loss of self-worth and dignity at the hands of PJ, and then felt invisible when the University refused to adequately address her pleas for help.

95.     **Three months** after her complaint, the University sent Jane a letter in response to her complaints that contained one substantive sentence:  "Your allegations concerning PJ were unsubstantiated."

96.     With that, the University blatantly denied Jane's complaints were valid and ended their investigation.

97.      Not only did the University engage in a substandard investigation of Jane's complaints, shortly following the University's conclusion, Jane began experiencing further retaliation.

98.     She received anonymous calls threatening her about her having made a complaint against PJ.  Jane reported these calls to the University and the University police.

99.     The University also failed to maintain confidentiality of Jane's complaint and as a result, several University employees openly questioned Jane, chastised Jane, laughed at Jane, and humiliated Jane about being sexually harassed by PJ and

complaining about it.

100.   Jane has experienced the most inhumane forms of harassment and retaliation by the University as a result of her protected complaints. It has resulted in her failing classes and being constructively and literally forced out of the University.

101.   At all material times, the Defendant University was receiving federal funding as contemplated by Title IX for its activities including financial aid and research grants among other sources.

102.   Too, the University implemented and executed policies and customs in regard to the events that resulted in the deprivation of Plaintiff's constitutional, statutory and common-law rights.

103.   The University is responsible for ensuring that all of its employees are properly trained and supervised to perform their jobs.

104.   The University is responsible for the acts and omissions of its employees and agents.

105.   As early as April 12, 2016, the University received a report from the Plaintiff concerning the sexual assault, sexual harassment and hostile work environment she experienced while working at the University.

106.   Following the report, the University failed to adequately investigate Plaintiff's complaints in violation of Title IX.

107.   Upon information and belief, the University failed to report the criminal acts involved in the report it received from Plaintiff in violation of its obligations under

the Cleary Act.

108.   The University failed to provide a safe academic environment for the Plaintiff, and faced with the Plaintiff's and other students' reports of harassment, the University's response, and its officials' conduct, was such that future reasonable students in Plaintiff's circumstances would be chilled from reporting sexual harassment.

109.   The Defendant University employees, including high ranking officials, conspired amongst themselves, and with other University employees, with the common purpose of violating Plaintiff's rights in relation to the reports of sexual harassment and misconduct that the Plaintiff provided within a timely manner.

## IV.   CAUSES OF ACTION

## A.   VIOLATION OF TITLE IX 20 U.S.C. § 1681, *et. seq.*

110.   Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs 8 through 109 above and incorporates them all here as though fully set forth.

111.   The sex-based harassment articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities and/or benefits provided by the school.

112.   Defendant, through its agents, supervisors, or employees created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S. C. 1681 because:

   a.   Plaintiff was  member of a protected class;

    b.  Plaintiff was subjected to sexual harassment in the form of sexual slurs, touching and assault by a faculty member;

    c.  Plaintiff was subjected to this harassment based on her sex (female); and

    d.  Plaintiff was subjected to a hostile education environment created by the Defendant's lack of policies and procedures and/or its custom to ignore its own policies and policies and Defendant's failure to properly investigate and/or address the sexual assault and subsequent harassment.

113.    Defendant and its officials had actual knowledge of the sexual harassment and sexual assaults beginning in April 2016 but failed to investigate and/or discipline Plaintiff's harasser in a timely manner and consistent with federal and state law.

114.    The Defendant's failure to promptly and appropriately respond to the alleged sexual harassment resulted in Plaintiff, on the basis of her sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in the Defendant's education program in violation of Title IX.

115.    Defendant failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

116.    Defendant persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

117.    Defendant, through PJ and others, engaged in a pattern and practice of behavior designed to discourage, and which did in fact discourage, Jane—who had been sexually harassed and assaulted—from seeking protection and from seeking to have sexual harassment and/or assaults from being fully investigated.

118.    This policy and/or practice constitutes disparate treatment of females like Jane and has had a disparate impact on female students in general.

119.    Plaintiff has suffered financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of Defendant's deliberate indifference to her rights under Title IX.

**B.**    **42 U.S.C. § 1983 VIOLATIONS**

120.    Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs 8-109 above and incorporates them here as though fully set forth.

121.    42 U.S.C. § 1983 provides remedies and redress to citizens deprived of any rights, privileges or immunities secured by the United States Constitution.

122.    The Fourteenth Amendment provides that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

123.    Defendant violated Plaintiff's rights, privileges or immunities secured by the United States. Specifically, Plaintiff's right to be free from harassment, assault, and a hostile school and work environment based on gender was invaded and violated

by Defendant.

124. Defendant fostered a system, practice, procedure and/or policy that caused and/or contributed to the injuries and damages complained of herein by Plaintiff. This system, practice, procedure and/or policy includes inadequate policies and/or enforcement of policies regarding the protection of the Defendant's students' from sexual harassment, sexual assault, and hostile work environment based on gender.

125. Further, the Defendant permitted, ratified and/or acquiesced to flagrant misconduct by ignoring and/or not applying appropriate redress, accountability and/or policies regarding Plaintiff's complaints of sexual harassment, sexual assault, hostile work environment and retaliation.

126. Defendant's personnel, including PJ and ER, were and/or allowed to believe that their acts and/or omissions were acceptable even though the acts and/or omissions violated constitutional standards. Conduct which, when viewed objectively, would be seen as unreasonable was permitted, tolerated, ratified and/or allowed by Defendant's decision makers.

127. At all relevant times, PJ and ER were employed by Defendant and were involved in the incidents made the basis of this lawsuit. PJ and ER, while acting under the color of state law, as authorized, permitted, tolerated, allowed and/or ratified by Defendant, deprived Plaintiff of her constitutional rights.

128. Defendant's misconduct and constitutional violations, including

additional misconduct which discovery will likely reveal, were a motivating force behind the incidents in question. Defendant's misconduct was undertaken with malice or reckless, deliberate indifference to the federally protected rights of Plaintiff.

129.    As a consequence of Defendant's misconduct, Plaintiff suffered severe injuries and damages.

## V.    JURY DEMAND

130.    Plaintiff requests that this action be heard before a jury.

## VI.    DAMAGES

131.    Defendant's conduct constitutes violations of statutory and/or common law. Such unlawful conduct seriously affected Plaintiff in her education and occupation. Because of Defendant's unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer financial loss, humiliation, mental anxiety and stress, and other damages. Plaintiff has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies and procedures of Defendant. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages in an amount to be proved at trial.

132.    Because of Defendant's unlawful and tortious conduct, it has been necessary for Plaintiff to retain the undersigned attorney to represent her in these causes of action Plaintiff has agreed to pay her attorney reasonable attorney's fees for the preparation and trial of these causes, and further for any appeal thereof should same

become necessary.

133.   Additionally, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve her ability to earn a living.  Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

134.   Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant.  Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against them and to avoid unjustly enriching Defendant.

## VII.   PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

a.   Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any practice which discriminates on the basis of gender and protected complaints.

b.   All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of

earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

  c.  Compensatory damages for pain and mental suffering in the past and future;

  d.  Reasonable attorney's fees, with conditional awards in the event of appeal;

  e.  Pre-judgment interest at the highest rate permitted by law;

  f.  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

  g.  Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

  h.  Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any amendment hereto.

Respectfully submitted,

The Murphy Law Practice, PLLC

/s/   *Marjorie A. Murphy*
Marjorie A. Murphy
Attorney-in-Charge
State Bar No. 24013218
S.D. Bar No. 34512
3355 W. Alabama, Ste. 670
Houston, Texas  77098
Telephone:  (832) 564-3804
Facsimile:  (832) 553-7441
Email: marjorie@themurphylawpractice.com
**ATTORNEY FOR PLAINTIFF**

**Of Counsel**

PLANTE LAW FIRM, P.C.

/s/ *Victoria Plante-Northington*
Victoria Plante-Northington
State Bar No. 00798436
S.D. Bar No. 21235
5177 Richmond Avenue, Suite 1140
Houston, Texas 77056
(713) 526-2615 (Telephone)
(713) 513-5176 (Facsimile)
Email: victoria@plantelawfirm.com
**ATTORNEY FOR PLAINTIFF**