**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JANE DOE,** | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL NO. 4:17-cv-1957** |
| | § | |
| **v.** | § | |
| | § | |
| **PRARIE VIEW A&M UNIVERSITY,** | § | **JURY TRIAL DEMANDED** |
| **Defendant.** | § | |

---

**PLAINTIFF JANE DOE'S RESPONSE TO**
**DEFENDANT PRARIE VIEW A&M UNIVERSITY'S RULE 12(B) MOTIONS TO DISMISS**

**EXHIBIT 1**

---

 Positive

As of: October 27, 2017 10:34 PM Z

## *Herndon v. College of the Mainland*

United States District Court for the Southern District of Texas, Galveston Division

February 13, 2009, Decided; February 13, 2009, Filed

CIVIL ACTION NO. G-06-0286

**Reporter**

2009 U.S. Dist. LEXIS 12425 *; 2009 WL 367500

HEATHER HERNDON, Plaintiff, v. COLLEGE OF THE MAINLAND, Defendant.

**Prior History:** *Herndon v. College of the Mainland, 2007 U.S. Dist. LEXIS 53694 (S.D. Tex., July 25, 2007)*

## Core Terms

harassment, sexual harassment, instructor, Academy, classmates, complaints, actual notice, appropriate person, summary judgment, noose, teachers, sexually, disciplinary, notice, Coordinator, asserts, talk, discipline, deposition, argues, burn, male, male student, responded, disparate impact, requirements, Warning, cases, summary judgment motion, alleges

**Counsel:  [*1]** For Heather Herndon, Plaintiff: Grover G Hankins, LEAD ATTORNEY, The Hankins Law Firm PLLC, Houston, TX.

For College of the Mainland, Defendant: Kimberly Marie James, LEAD ATTORNEY, Bracewell Giuliani LLP, Houston, TX.

**Judges:** Lee H. Rosenthal, United States District Judge.

**Opinion by:** Lee H. Rosenthal

## Opinion

### MEMORANDUM AND ORDER

This opinion addresses the remaining claims in this suit brought by Heather Herndon against the College of the Mainland ("COM"). Herndon attended COM as a night student in its Fire Academy program between August

2004 and February 2005. In a previous opinion, this court granted summary judgment dismissing Herndon's *Thirteenth Amendment*, *Fourteenth Amendment*, and negligent supervision claims against COM and Herndon's *Thirteenth Amendment*, *Fourteenth Amendment*, negligent supervision, and Title IX claims against the individual defendants, COM Judicial Officer Rebecca Miles, Fire Academy Director Larry Keller, and Fire Academy instructors Larry Pander and Samuel Scott. (Docket Entry No. 45).

Herndon's remaining claims are asserted against COM under Title IX, *20 U.S.C. § 1681*. Herndon alleges that she was subjected to sexual harassment by her classmates and instructors that resulted in a sexually  **[*2]** hostile work environment and that COM officials were deliberately indifferent to her complaints. Herndon also alleges that she experienced sex discrimination in the physical tasks she was required to perform, in certain conditions of the training, and in the discipline she received for infractions.

COM has moved for summary judgment, asserting that the undisputed facts show that, as a matter of law, COM officials had no actual notice of, and were not deliberately indifferent to, Herndon's sexual harassment complaints. COM also asserts that the undisputed facts show that Herndon was not subject to sex discrimination. Herndon responds that the summary judgment evidence shows disputed facts material to determining whether COM officials had actual notice of the harassment; whether COM officials were deliberately indifferent; and whether COM's physical requirements and disciplinary penalties for infractions discriminated against female students.

Based on the pleadings; the motion, response, and reply; the summary judgment record; and the applicable law, this court denies COM's motion for summary

Herndon v. College of the Mainland

judgment on Herndon's Title IX sexual harassment claim and grants COM's motion for summary judgment **[*3]** on the Title IX sex discrimination claim. A scheduling conference is set for **February 27, 2009, at 9:00 a.m.** in Courtroom 11-B. The Supreme Court has just issued an opinion on the relationship between Title IX and *42 U.S.C. § 1983*, holding that Title IX is not an exclusive remedy. *Fitzgerald v. Barnstable School Comm., -- U.S. --, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009)*. The parties should address any impact of this case at the conference.

The reasons for these rulings are set out below.

**I. Background** [1]

_____

[1] The summary judgment record includes Herndon's affidavit dated February 16, 2007, (Docket Entry No. 64, Ex. 5); the declaration of Steve Keller, the Director of the Fire Academy, dated July 10, 2008, (Docket Entry No. 60, Ex. A); an October 28, 2004 memorandum from Keller to Herndon entitled "Disciplinary Violation," (*id.,* Ex. A-1); an October 23, 2004 email from instructor Gary Staudt to Keller re: Herndon's night class, (*id.,* Ex. A-2); COM's Fire Training Academy Rules and Regulations, dated July 26, 2001, (*id.,* Ex. A-3); an October 7, 2004 and a November 19, 2004 document entitled "Instructor's Warning for Herndon re: Academic Failure," signed by instructor Larry Pander, (*id.,* Exs. A-4, A-5); a November **[*4]** 20, 2004 memorandum from Pander to Keller re: "Herndon," (*id.,* Ex. A-6); a November 22, 2004 memorandum from Keller to Herndon re: "Dismissal Contract," (*id.,* Ex. A-7); a December 6, 2004 "Instructor's Warning for Herndon re: tardiness" signed by Pander, (*id.,* Ex. A-8); a January 29, 2005 memorandum from instructor Mark Allen to Keller re: "Herndon's decision to leave class without permission," (*id.,* Ex. A-9); a January 31, 2005 "Instructor's Warning for Herndon re: leaving class prior to dismissal" signed by Scott, (*id.,* Ex. A-10); a January 31, 2005 "Instructor's Warning for Herndon re: Failure to bring bunker gear" signed by Scott, (*id.,* Ex. A-11); a February 14, 2005 memorandum from Pander to Keller re: "Documentation of Herndon's disrespect," (*id.,* Ex. A-12); an undated memorandum to the file by Keller, (*id.,* Ex. A-13); student statements dated February 19, 2005 "re: noose incident," (*id.,* Ex. A-14); an October 7, 2005 expulsion letter from Rebecca Miles, COM's Judicial Officer, to Fire Academy student "J.," (*id.,* Ex. A-15); disciplinary write-ups for male students in Herndon's Fire Academy class, (*id.,* Ex. A-16); a declaration by Pamela Davenport, COM's Title IX Coordinator, **[*5]** dated December 2006, (*id.,* Ex. B); a declaration by Rebecca Miles, dated December 13, 2006, (*id.,* Ex. C); a February 21, 2005 email from Lonica Poindexter, COM's Director of Diversity and Equity, to Keller, Cissy Matthews, Keller's supervisor, and Eugene Connor (who is not otherwise mentioned in the record) "re: Herndon's complaint and investigation," (*id.,* Ex. C-1); a Probation Contract for

Herndon is an African-American female. In August 2004, she enrolled in COM's Fire Academy night class for the 2004-2005 school year. Two of the twenty-four students in the class were female.

**A. The Summary Judgment Evidence as to Sexual Harassment**

Herndon testified in her affidavit that "[f]rom the **[*6]** first day of classes," she was sexually harassed by her male classmates. Herndon stated that the men made "ceaseless," "bothersome and demeaning requests" for dates, despite the fact that she was married, and that the requests "became more lurid, lewd, lascivious, primal and threatening as the semester continued." (Docket Entry No. 64, Ex. 5 P 9). She described her male classmates making "sexually . . . suggestive motions to their groin area" and "constantly talk[ing] about different parts of [her] anatomy." (*Id.*). Herndon testified that during the physical exercise period, while the students were wearing shorts and stretching, her classmates "would make remarks such as 'I sure would like a piece of that!' or 'M-m-m-good!'" (*Id.*). Herndon stated in her affidavit that her classmates "constantly used the word 'pussy' in [her] presence," (*id.,* Ex. 5 P 10) and testified in her deposition that they called her a "cunt," (Docket Entry No. 60, Ex. E at 39). She also stated in her affidavit that her male classmates would use "negative racial slurs" when she rejected their advances, and that they "talked incessantly about [her] African-American heritage and what that meant sexually." (Docket **[*7]** Entry No. 64, Ex. 5 P 10). Herndon testified in her affidavit that this conduct escalated as the school year progressed, and that she told her instructors about it "continually," (*id.,* Ex. 5 PP 9, 11), [2] and testified in her deposition that she

_____

Herndon, dated February 23, 2005, (*id.,* Ex. C-2); Rebecca Miles's February 28, 2005 handwritten notes from interviews of Herndon's classmates, (*id.,* Ex. C-3); a note from Miles to Keller "re: resolution of Herndon's complaint," (*id.,* Ex. C-4); a declaration by Samuel Scott, dated December 2006, (*id.,* Ex. D); a February 18, 2005 "Instructor's Warning for Herndon re: tardiness," signed by Scott, (*id.,* Ex. D-1); and excerpts from Herndon's June 27, 2008 deposition, (*id.,* Ex. E; Docket Entry No. 65, Ex. F).

[2] Herndon's brief in opposition to the summary judgment motion asserts that, in accordance with the COM Student Handbook's "Chain of Command" policy, she reported the harassment on numerous occasions to her class officer. The brief asserts that Herndon had been following the "chain of command to no avail" before any COM supervisor received

Herndon v. College of the Mainland

"complain[ed] a lot" to her instructors about the harassment, which grew worse over the course of the school year, (Docket Entry No. 60, Ex. E at 30).

Herndon testified in her deposition and affidavit that her instructors contributed to a sexually hostile environment by failing to stop the harassment they witnessed and that she reported, and by making sexually inappropriate comments to the class themselves. She asserted that instructor Larry Pander told "sexually suggestive war stories" to the class. She also testified that instructor Samuel Scott made "lurid references" when explaining rescue carry positions to the students, including referring to one such position as the "eat it out" or "pussy eating" position. (Id., Ex. E at 31; No. 64, Ex. 5 PP 11, 12, 13).

COM has presented no testimony from Pander about whether Herndon complained to him about harassment, whether he saw the male students making sexually offensive gestures or statements, or whether he made sexually offensive statements in class himself. In his affidavit, Scott testified that Herndon "never complained to [him] that any **[*9]** of the other students were sexually or racially harassing her." Scott did not state whether he witnessed students making sexually offensive comments or gestures to Herndon or whether he made such statements in the class. (Docket Entry No. 60, Ex. D P 3).

COM's Director, Steve Keller, testified that Herndon made "a passing comment" to him on October 11, 2004 that she thought a male student was sexually harassing her "because he had continued to ask her out even after she said 'No.'" (Id., Ex. A P 5). Keller testified that he received no further notice of any harassment until February 15, 2005, when Herndon told him that there was a "hostile environment" in class "based on inappropriate comments being made by Mr. Pander and by the other students." (Id., Ex. A P 10). [3] COM's class

---

actual notice of her complaints. (Docket Entry No. 64 at 12-14). Herndon does not cite to evidence in the record showing that she told a class officer about harassment and this court has not located such evidence. The Chain of Command policy -- which is not specifically related to sexual harassment but instead describes the "Organization" of COM -- is set forth in COM's Fire Training Academy Rules and Regulations. It provides that "trainees should go through their **[*8]** class officers concerning any problems, requests, etc., requiring the attention of the Director. If problems arise of a personal or confidential nature, trainees may contact the coordinator or Director at any time." (Docket Entry No. 60, Ex. A-3).

[3] Herndon's brief in opposition to COM's summary judgment

president, Jason Cox, told Keller on February 16, 2005 that Herndon's classmates "would make inappropriate comments but not in a way that would be offensive." (Id., Ex. A-13). That same day, Keller learned from both Pander and Cox that Pander had used "disparaging terms and inappropriate language . . . in the classroom." (Id.). Other members of COM's administration did not learn about the alleged harassment until **[*10]** February 21, 2005. Herndon resigned from COM two days later, on February 23, 2005. (Id., Exs. B P 4, C).

In addition to Herndon's complaints of persistent verbal harassment throughout her time at COM, she also complains of specific incidents. The evidence as to each incident is described below.

## 1. The Book-Bag Incident -- October 2004

On October 11, 2004, Herndon had an altercation with a male classmate who tried to put his book bag on her desk. According to Keller, who investigated the incident, "[t]he male student kept putting the bag on the desk and Ms. Herndon kept pushing it off. The confrontation degenerated into screaming and name calling, and the students had to be separated." (Id., Ex. A P 4). The instructor was not in the room when the altercation took place. A female instructor from a different class across **[*11]** the hall mediated the dispute. (Docket Entry No. 64, Ex. 5 P 13). According to Keller, this female instructor told him that Herndon had admitted that she had "deliberately decided to 'bug' the male student." (Docket Entry No. 60, Ex. A P 4).

Herndon's testimony about this event was largely consistent with Keller's account. But Herndon added that she fought with the student because she had been provoked by his harassment. According to Herndon, the male student started harassing her after she refused several times to go out with him. Herndon testified that she picked the fight to encourage this classmate to lose interest in her:

> [B]y me pushing his backpack off the desk, I did it to piss him off because my theory at the time was there's something -- you know, he wants to get laid or there's something because he keeps asking me out. . . . I figured if I would be a super bitch to him,

---

motion asserts that she "lodged each of her numerous complaints to Pander and Keller." (Docket Entry No. 64 at 4). She does not cite to such evidence in the record. This court could not locate summary judgment evidence that Herndon complained to Keller about harassment between October 11, 2004 and February 15, 2005.

Herndon v. College of the Mainland

that it would just disgust him so much that he would just leave me alone and that would be the end of it.

(*Id.,* Ex. E at 39-40).

Keller acknowledged that when he interviewed Herndon as part of his investigation, she "made a passing comment that she thought the male student was sexually harassing her, because **[*12]** he had continued to ask her out even after she said 'No.'" (*Id.,* Ex. A P 5). Keller testified that he responded by attaching a copy of COM's student handbook section on sexual harassment to a disciplinary memorandum about the book-bag incident that he sent to Herndon on October 18, 2004. The disciplinary memorandum stated in part as follows:

Additional information that surfaced during this [investigation] involved a comment that you felt that Cadet S. may have sexually harassed you. The College of the Mainland will not tolerate sexual harassment in any form. I have attached information published in the student handbook in regards to sexual harassment policy and procedures. Please feel free to take any action necessary to address this concern.

(*Id.,* Ex. A-1). The disciplinary memorandum also stated that Herndon would be required to complete a four-page paper titled "Influence of Employee Behavior on the Workplace" as punishment for her role in the incident. The memorandum encouraged Herndon to visit COM's counselor about conflict-resolution alternatives and to apologize "to all parties subjected to [her] inappropriate behavior." (*Id.*). Herndon does not dispute that the male student involved **[*13]** in the incident was "disciplined equally." (*Id.,* Ex. A P 4).

The policy attached to Herndon's disciplinary memorandum defined sexual harassment as "unwanted and unwelcome verbal or physical conduct of a sexual nature, whether by word, gesture, or any other sexual conduct, including requests for sexual favors." (*Id.,* Ex. A-1). The policy set out a procedure for referring reports of "not minor" sexual harassment to a particular administrator, the Title IX Coordinator:

All reports of sexual harassment that are not minor shall be referred to the Title IX Coordinator (Vice-President for Student Services). Oral complaints shall be reduced to writing to assist in the District's investigation. Complaints shall be treated as confidential. Limited disclosure may be necessary to complete a thorough investigation. The District shall not retaliate against a student who in good faith reports perceived sexual harassment or sexual abuse. All college staff responsible for conferences

and documentation will ensure that all evidence is maintained appropriately, that the rights of all parties involved are protected and that all time lines are followed.

(*Id.*). The policy also set out a procedure for students **[*14]** with sexual harassment complaints:

A student who has a complaint alleging sexual harassment by other student(s) or sexual harassment or sexual abuse by an employee may request a conference with the Title IX coordinator for students. The student may be accompanied by an advisor at the initial conference and throughout the complaint process. The initial conference with the student shall be held with either the College Ombudsperson or designee and the person will be of the same gender as the student. The conference shall be scheduled and held as soon as possible, but in any event within seven days of receipt of the complaint. At the conference, the person(s) bringing the complaint shall be informed of the right to file a complaint with the Office of Civil Rights. The Ombudsperson or designee shall coordinate an appropriate investigation, which ordinarily shall be completed within seven days of receipt of the complaint. The student shall be informed if extenuating circumstances delay the investigation. Nothing in the complaint process shall have the effect of requiring a student alleging sexual harassment to report the matter to a person who is the subject of the complaint.

(*Id.*). The policy **[*15]** provided two levels of appeal from action (or lack thereof) on a complaint. (*Id.*).

Neither Herndon nor Keller reported the October 2004 book-bag incident under the sexual harassment complaint policy. Herndon stated that she did not make a report because Keller stated that he would "take care of it." [4] According to Herndon, Keller also promised that

---

[4] Herndon testified that she talked about the incident with a male instructor -- whose name she did not remember -- who was not one of her regular instructors. (Docket Entry No. 60, Ex. E at 40). It is not clear from the record whether that instructor was Keller. It is also not clear from Herndon's testimony what she told this instructor. Herndon did recall stating, in response to the instructor's question, "[d]o you feel like you're being sexually harassed," that she "d[idn't] want to make this a big deal. In the academy . . . me being the only woman, I need these guys to graduate." (*Id.*). Herndon recalls that the instructor responded that "[i]f you're being harassed, you need to say something," and that they "fill[ed] out paperwork." (*Id.*).

Herndon v. College of the Mainland

he would "give the students a talk. This will not be tolerated. It won't happen again." (*Id.,* Ex. E at 52). [5] Herndon testified that she chose not to file a formal sexual harassment complaint under school policy at that time because she believed that if she reported the conduct to the administrators, she would have "flunked," and she "want[ed] to get through this academy." (*Id.,* Ex. E at 52-53). Herndon explained:

> I wanted to graduate. And I knew -- it's like I said, the moment -- I didn't want to become alienated. Because the moment that I became alienated, that was it. I was basically done. If everyone's refusing to work with me on drills, I can't do these drills. I fail. . . . [W]e had tutoring programs, and we'd have to be paired up in groups. If no one is willing to work with me, then I fail that assignment. So, I just knew that that **[*16]** was the last resort.

(*Id.,* Ex. E at 89).

## 2. The December 2004 Statement

The next incident that Herndon identifies as sexual harassment occurred shortly before the 2004 holiday break. According to Herndon, Pander informed the students that the class would need to meet at some point during the holidays. Herndon told Pander that meeting for a class over the holidays would be difficult because she had to care for her two young children. According to Herndon, Pander replied in front of the class: "the only reason that we are keeping you around is that you are Black and a woman and we have a quota to meet." (Docket Entry No. 64, Ex. 5 P 16). Herndon has offered no evidence that she reported this statement to another instructor, to Keller, or to any other member of COM's administration. COM's evidence and briefing do not address this statement.

---

[5] Herndon testified in her deposition that Keller responded to the October book-bag incident by giving the class a "cultural diversity talk." (Docket Entry No. 60, Ex. E at 53). According to Keller, he did not give the diversity talk -- what he refers to as an hour-long "Firefighting Professionals" presentation -- until Herndon came to him with another complaint in February 2005. (*Id.,* Ex. A-13). Keller testified **[*17]** that his only action in October 2004 was to give Herndon a copy of the school's sexual harassment policy. (*Id.*). Herndon's brief states that Keller gave this "cultural diversity talk" in February 2005. (Docket Entry No. 64 at 15).

## 3. The Make-Up Assignment Incident -- February 14-16, 2005

The summary judgment evidence shows that on February 15, 2005, Herndon visited Keller's office to complain **[*18]** about the classroom environment. Keller wrote a memo to the file after the meeting. The memo states that Herndon told Keller that Pander had made "numerous inappropriate comments during class" and had called her "raghead" and "stupid fucker." Herndon admitted that she had an altercation with Pander the day before, on February 14, after she told Pander, in front of the class, "[y]ou don't have be a smart ass." Keller offered Herndon the option of sitting down to talk with Pander. Herndon said that she would be open to that. (Docket Entry No. 60, Ex. A-13). Keller testified that he and Herndon "discussed [his] concerns about her recent failure to successfully complete the obstacle course training, which . . . [w]as the result of her lack of upper body strength." (*Id.,* Ex. A P 10). Herndon does not address her meeting with Keller or the incident that prompted it.

In his memo to the file, Keller stated that he followed up with Pander the following day, February 16. According to the memo, Pander admitted that "he had made those comments but didn't realize they were offensive to any of the cadets." (*Id.*). Pander explained that Herndon had interrupted him three times and called him a "smart **[*19]** ass" as he was trying to explain the deadline and procedure for making up missed class hours. (*Id.,* Ex. A-12). The memo stated that Pander agreed "that he understood the school policy and would refrain from any comments that could be considered unprofessional," and "would not allow students to make unprofessional comments." (*Id.,* Ex. A-13).

Keller's memo also stated that he spoke on February 16 with the class president, Jason Cox. According to the memo, Cox confirmed that Pander "sometimes made comments that were inappropriate," but that "he had really improved in recent weeks" and had not provoked the most recent incident with Herndon. Cox confirmed that other students "would [also] make inappropriate comments," but, in his opinion, "not in a way that would be offensive." Cox told Keller that Herndon was often "disrespectful" in class, was "just out to cause trouble with the instructors and the class," and "caused so much trouble that when she talk[ed]," the other students would "cringe." (*Id.*).

Keller's memo described his February 16 presentation to the night class of a one-hour "Firefighting Professionals" training session in which the class

Herndon v. College of the Mainland

"discussed the importance of respect to **[*20]** individuals regardless of our differences." The session included discussion on "discrimination, disparaging remarks, sexual harassment, and how jokes and comments can divide a team." In the session, Keller "explained that each individual is responsible for his or her behavior" and "reinforced the college policy of no tolerance for this type of behavior." (*Id.*). Herndon testified that Keller's presentation led her to believe that he had not taken her complaint seriously. (*Id., Ex. E at 53*). [6]

### 4. The Noose Incident -- February 18, 2005

The parties do not dispute that on February 18, 2005, during a knot-tying lesson, at least one member of Herndon's class tied a knot in the shape of a noose. The instructor, Samuel Scott, was out of the classroom. Herndon testified in her deposition that four of five classmates made nooses. (Docket Entry No. 65, Ex. F at 83). Herndon testified that one classmate "said that the nooses had thirteen loops which represented the **[*21]** thirteen states in the Confederacy." (Docket Entry No. 64, Ex. 5 P 17). Herndon testified that another student asked her if she knew what the noose was for. When Herndon asked, "[w]as it for hanging Black people?" the student replied that it "[w]as for hanging everyone." (Docket Entry No. 65, Ex. F at 82). According to Herndon, another student yelled, "Oop. It's time to go a [sic] Santa Fe," which Herndon testified was "a racially charged area where the KKK is." (*Id.*). Herndon testified that Scott walked into the classroom, saw the nooses, and said "[j]ust stop. Undo them." (*Id.*). Herndon "grabbed [her] stuff, and . . . left," because she was "absolutely terrified." (*Id.*). Herndon testified that she called Pander that night to tell him about the incident. (Docket Entry No. 64, Ex. 5 P 17).

Scott testified that he saw no nooses and no student told him about nooses when he reentered the classroom. Scott testified that he later learned that one student had tied a noose. (Docket Entry No. 60, Ex. D P 4).

Keller's undated memo to the file stated that Herndon called Pander at home on midnight on February 18 to tell him that one student in the class had made a noose and threatened her with **[*22]** it. (*Id., Ex. A P 14, Ex. A-13*). [7] The memo stated that Herndon told Pander that she would not attend class the next day because she felt threatened. (*Id.*). According to Keller's memo, Herndon asked Pander for Keller's home telephone number, which Pander refused to provide. Pander told Herndon to talk to her instructor in class the next day.

Pander talked to Keller the next morning. (*Id.*). Keller and Pander agreed to require each of Herndon's classmates to write a statement about the incident. (*Id.*). At this point, Keller determined that "things were beginning to get over [his] head." On February 19, 2005, Keller asked his supervisor, Cissy Mathews, if someone higher up at COM could take over the investigation of the noose incident. (*Id., Ex. A P 15, Ex. A-13*). Matthews replied that a meeting was already scheduled for the following Monday, February 21, with Herndon and the Human Resources department about her "sexual harassment complaint," and that no **[*23]** further action on Keller's part was necessary. (*Id.*). Pamela Davenport, COM's Title IX Coordinator, testified that she first received notice of Herndon's complaints on February 21, 2005. (*Id., Ex. B P 4*). The record does not indicate that Keller forwarded the results of his investigation into inappropriate comments made by Pander or by Herndon's classmates to Matthews, Davenport, or any other members of COM's administration.

The students' statements about the noose incident, written on February 19, 2005, revealed that at least two students were involved in tying nooses and that more made comments about the nooses. One student recounted that "M. was playing with this rope and tied a noose. I had him show me how to tie one." (*Id., Ex. A-14 at 3*). Student M. corroborated: "I tied a noose and S. was overlooking me, and asked if I could show him how to tie it, so I did, and I told them that mine was better and pretty much perfect." (*Id., Ex. A-14 at 5*). [8] According to another student, students S. and G. responded that "in order to be perfect, [the noose] had to have 13 rings in it representing the stars on the Rebel flag." (*Id., Ex. A-14*

---

[6] Herndon testified in her deposition that Keller gave this presentation in October 2004. (Docket Entry No. 60, Ex. E at 53). In her brief, Herndon agreed with COM that the presentation was in February 2005. (Docket Entry No. 64 at 15).

---

[7] Herndon's brief in opposition to summary judgment asserts that she tape-recorded the noose incident and "took it to Defendant Pander." (Docket Entry No. 64 at 6). She does not cite to summary judgment evidence supporting this assertion.

[8] According to COM's Judicial Coordinator, Rebecca Miles, who subsequently investigated the incident, the student "who tied the noose and showed it to the class" was an African-American. (*Id., Ex. C P 10*).

Case 4:17-cv-01957   Document 8-1   Filed on 10/27/17 in TXSD   Page 8 of 25
Page 8 of 25
Herndon v. College of the Mainland

at 4). Another student reported: "Heather said 'that's **[*24]** the knot they used to hang black folks.' I said no, they hanged everyone with that knot. S. said some states use all forms of exicution [sic] for death penalty and hanging was still used." (*Id.*, Ex. A-14 at 1). Yet another student stated: "I don't know who all were involved, but [they] began to talk about when they used nooses back in the old days to hang people." (*Id.*, Ex. A-14 at 2). That student also stated that no one had directly threatened Herndon: "In know [sic] way did I here [sic] any one threaten Heather['s] life at all." (*Id.*). Another student confirmed that the group discussed that a "real noose had 13 loops going around it," and that "Heather asked if that [was] what they used to hang black people with," but added that "NOT ONCE was there any talk of COLOR, SEX, or any of that in these conversations, NOR was anything said or sounded like a thret [sic] on or twards [sic] any one." (*Id.*, Ex. A-14 at 11).

## 5. The Simulated House-Fire Incident -- February 2005

Herndon testified **[*25]** that sometime in February 2005, during a simulation of a house fire, her classmates left her alone in a burning building and closed the door behind them. (Docket Entry No. 64, Ex. 5 P 18). According to Herndon, she "told Pander and Keller what had happened," but "no disciplinary action was taken." (*Id.*, Ex. 5 P 19). Herndon did not state when this incident occurred but asserted that it "caused [her] to leave the Academy." (*Id.*, Ex. 5 P 18). Keller denied that he was told of this incident. Indeed, Keller denied that he was told about any incident other than the October 2004 book-bag incident and the February 2005 incidents involving the comment by Pander and the students tying nooses. There is no evidence in the summary judgment record that Herndon told any other member of COM's administration about being left in a burning building. COM does not address this incident.

## 6. The Formal Sexual Harassment Complaint -- February 21, 2005

According to COM, on February 21, 2005, three days after the noose incident, Herndon went to COM's Director of Diversity and Equity, Lonica Poindexter, to complain about sexual and racial harassment. (Docket Entry No. 60, Ex. B P 2). The following morning, Poindexter **[*26]** began investigating. (*Id.*, Ex. C-1). Poindexter met with Herndon that afternoon to "advise[]

her that an investigation would take place" and to "g[ive] her a copy of the policy regarding student complaints of sexual harassment." (*Id.*). That same afternoon, Pamela Davenport, COM's Vice President for Student Services and the Title IX Coordinator, learned of Poindexter's investigation and determined that it would be more appropriate for COM's Judicial Coordinator, Rebecca Miles, to investigate. (*Id.*, Ex. B P 2). Davenport explained that Poindexter was an employee of COM's Human Resources department and was not specifically tasked with investigating student complaints. By contrast, investigating student complaints was one of Miles's specific job duties. (*Id.*, Ex. B PP 2, 3). That afternoon, Poindexter turned over the information she had gathered to Miles and told Keller and Keller's supervisor, Cissy Matthews, that Miles would be continuing the investigation. (*Id.*, Ex. C-1).

Herndon testified that the first person she approached to complain about harassment in February 2005 was COM's Counselor, Bill Spiller, not Poindexter. (*Id.*, Ex. E at 30-31). Herndon testified that she later spoke to **[*27]** Poindexter because her title included the word "Diversity" and talking to her was "common sense." Herndon testified that she "basically told [Poindexter] everything." (*Id.*, Ex. E at 87).

According to Miles, she and Spiller met with Herndon the night of February 21, 2005. Miles testified that she "asked Ms. Herndon what resolution to her complaint she wanted." Herndon replied that "she wanted Mr. Pander to agree to stop using inappropriate comments, and she wanted something in writing in his file to that effect." (*Id.*, Ex. C P 4). Herndon confirmed that Miles and Spiller met with her and "a few others in the office just as witnesses." (*Id.*, Ex. E at 31). According to Herndon, Miles "made comments and references regarding the 'severity' of the infractions in [Herndon's disciplinary] file" before turning to Herndon's sexual harassment complaints. (Docket Entry No. 64, Ex. 5 P 20).

Miles testified that after the meeting with Herndon, she spoke with Keller and Pander. The record does not indicate whether Pander admitted any misconduct to Miles. Pander "agreed that he would not make any inappropriate comments [i]n the future." Miles told Pander "that [she] would place something in writing **[*28]** in his file to that effect." (Docket Entry No. 60, Ex. C P 5). COM has attached a copy of the note Miles wrote and sent to Keller to be placed in Pander's file. The undated note states:

    To complete resolution of Heather Herndon's

Herndon v. College of the Mainland

sexual harassment claim, I asked Heather what she wanted the outcome to be. We had discussed this Monday night in Dr. Spillar's [sic] presence, but I wanted to make sure her claims were addressed completely and that she was satisfied with the resolution.

Heather stated that she wanted something documented in Mr. Pander's file that this happened and that he has agreed to refrain from this type of behavior in the future.

I am sending this email to you to notify you that I have talked with Mr. Pander and he has agreed to refrain from any inappropriate or offensive language.

Heather stated to me that the issue is now resolved. Please place a copy of this email in Mr. Pander's file.

(*Id.,* Ex. C-4).

Miles testified that during her conversations with Keller and Pander, she determined that Herndon's grades and disciplinary infractions were probably grounds for dismissal from the Fire Academy. According to Miles, she and Keller decided to give Herndon "yet one more chance" **[*29]** and drafted an academic Probation Contract for Herndon to sign. (*Id.,* Ex. C P 6; Ex. C-2).

Miles testified that on February 23, 2005, she met with Herndon again. They "discussed the Probation Contract, and how it was specifically intended to lay out for . . . Herndon what she needed to successfully complete the Fire Academy." Herndon signed the Probation Contract. (*Id.,* Ex. C P 7). Miles testified that she and Herndon then discussed the harassment complaints. Herndon "again said that she wanted Mr. Pander to agree to refrain from inappropriate language, including sexual innuendos, cursing, and racial slurs," and that she "wanted something in writing placed in Mr. Pander's file about his agreement." (*Id.,* Ex. C P 8). Miles told Herndon that Pander had agreed to stop making such comments and assured Herndon that she would place a note to that effect in Pander's file. According to Miles, Herndon "said that her complaint was now resolved, and the meeting ended." (*Id.*).

Herndon confirmed that this meeting occurred, adding that it was "impromptu" and "essentially the same conversation previously held." (Docket Entry No. 64, Ex. 5 P 20). Herndon did not testify that she told Miles that the **[*30]** note in Pander's file would resolve the issue. Herndon did, however, complain that Miles pulled her out of class for the meeting, during preparation for a "major exam" that was to occur within the hour. Herndon

also complained that during the meeting, Miles emphasized her academic shortcomings and disciplinary infractions. (*Id.*).

Herndon testified that after the meeting with Miles, she "went to the ladies restroom to compose [her]self," and that "Miles came in shortly thereafter and noticed that [Herndon] was visibly upset." (*Id.*). Herndon testified that she was frustrated about missing "valuable test preparation time" for the meeting that she had not asked for and that she thought was redundant. Herndon also testified in her deposition that as a result of her experiences at COM, she suffered from an ulcer and stress-related illness that required prescription medication. Herndon testified that these health issues negatively impacted her attendance and grades. (Docket Entry No. 60, Ex. E at 116, Docket Entry No. 64, Ex. 5 PP 14-15). During their talk in the restroom, Herndon suggested to Miles that "maybe [she] should leave the program altogether." (Docket Entry No. 64, Ex. 5 P 20). **[*31]** According to Herndon, "Miles promptly agreed with this proposition." (*Id.*). According to Miles, Herndon said "that she had decided to resign from the Academy[ ] because she knew she was not going to pass." (Docket Entry No. 60, Ex. C P 9). Herndon disputes this account.

The parties agree that Herndon left the Fire Academy on February 23, 2005. Herndon testified that she had one subsequent conversation with Poindexter, but the record does not indicate what they discussed. (*Id.,* Ex. E at 105). Herndon did not speak with anyone else at COM, did not participate in an exit interview, and did not fill out a withdrawal form. (*Id.*).

Miles testified that she had "lingering concerns" after Herndon's departure from the Fire Academy. Miles reviewed the students' handwritten accounts of the noose incident and, on February 28, 2005, interviewed Herndon's classmates. (*Id.,* Ex. C P 10). According to Miles's investigation notes, the students "never heard Mr. Pander call [Herndon] any names" or "ma[k]e any sexually explicit comments" or "racial comments." (*Id.,* Ex. C-3 at 1-2, 4). Another student commented that Pander "[n]ever said anything offensive," and that "[f]irefighters joke around." This same **[*32]** student commented that "class [wa]s a little less tense" after Herndon's departure, and that he "[c]ouldn't even make eye contact with her because of [her] allegations." He "never kn[e]w what she [wa]s thinking or might do." (*Id.,* Ex. C-3 at 7). Another student asserted that Herndon had "started many rumors in the academy," and stated that "[o]utside the classroom [the students] joke[d]

Herndon v. College of the Mainland

around." (*Id.,* Ex. C-3 at 1).

## B. Herndon's Sex Discrimination Claims

Herndon alleges that she also experienced sex discrimination because the Fire Academy applied the same physical requirements to men and women, which had a disparate impact on female students, and applied disparate discipline to female students.

## 1. Disparate Impact

Herndon argues that the physical requirements COM applied were unfair to the Fire Academy's female students. Herndon asserts that "[t]he curriculum at COM was more stringent than the State of Texas requirements for becoming a firefighter." She asserts that under the State's firefighter-skills requirements, women do not need to perform certain physical tasks at the same level as men. (Docket Entry No. 64 at 18). Both Texas and the COM firefighter requirements included a mile and **[*33]** a half run, but according to Herndon, Texas allowed women more time than men to finish. (Docket Entry No. 60, Ex. E at 122-23). Both Texas and the COM firefighter requirements included carrying a 250-pound dummy from one point to another, but according to Herndon, Texas allowed women to carry the dummy any way they could, while COM required that all students carry the dummy in specified positions. (*Id.*). Herndon testified that she would not do one of those positions, called a "fireman's carry," because the instructors referred to it as the "eat out" or "pussy eating" position. (*Id.,* Ex. E at 31).

Herndon does not cite a Texas statute, regulation, or manual setting out the physical requirements for firefighters. COM responds that its physical requirements are not "examples of gender discrimination, because . . . [Herndon] was treated the same way as the male students at COM." (*Id.* at 22-23).

## 2. Failure to Provide Restroom Facilities at Burn Sites

Herndon also complains about the absence of toilets at "burn drills," eight-hour-long events during which students practiced firefighting techniques on old or abandoned houses. During these burn drills, the students were required to wear full **[*34]** gear, which totaled 77 pounds. Because of the heat of the fire and the weight of the gear, students were encouraged to

drink large amounts of liquid to stay hydrated. (*Id.,* Ex. E at 115). There were no portable or other toilets at burn sites, and students were not allowed to leave. Students were told to urinate in nearby bushes or in the burning structure. (*Id.*). Herndon testified that she refused "to expose the lower half of [her] body going in a bush." (*Id.*). To avoid urinating, she would avoid drinking during burn drills, which caused her to faint on several occasions. (*Id.,* Ex. E at 115-16). Herndon testified that after she left COM, she enrolled at another fire academy at San Jacinto College. At this academy, portable toilets were provided at burn drills. (*Id.,* Ex. E at 123). According to Herndon, COM's refusal to provide portable toilets at burn sites was sex discrimination because females had to expose the lower half of their bodies to urinate. (Docket Entry No. 64 at 17).

COM replies that its failure to provide portable toilets at the burn sites was not discriminatory because it applied to both male and female students. COM also argues that the absence of toilet facilities was **[*35]** part of simulating real-life conditions. "[D]uring a real firefight (which the burn exercises are intended to simulate), porta-potties might not be conveniently provided for the firefighters, so COM's version of the exercise would have been more realistic than the exercises Plaintiff apparently attended at San Jacinto College." (Docket Entry No. 65 at 9).

## 3. Disparate Discipline

Herndon asserts that she was penalized more harshly than her male classmates for similar infractions. She testified that she was written up for forgetting to bring her bunker gear to class, while a male classmate who also forgot his bunker gear was not. (Docket Entry No. 64 at 17). Herndon identifies no other instance of disparate treatment. COM responds by attaching an Instructor's Warning that Pander issued to a male student for forgetting his bunker gear on January 31, 2005. (Docket Entry No. 60, Ex. A-16 at 7). COM also attaches an expulsion notice issued to a male student on October 7, 2004 for disruptive behavior, (*id.,* Ex. A-15), and Instructor's Warnings issued to Herndon's male classmates for infractions such as missed class hours, low test scores, and failure to report for training, (*id.,* Ex. A-16). **[*36]** [9] COM generally responds to Herndon's

---

[9] Herndon testified in her deposition that although Pander recommended numerous students, including Herndon, for dismissal, Keller did not heed those recommendations. Herndon testified that the program had been losing students --

Herndon v. College of the Mainland

sex discrimination allegations by pointing out that it "h[as] had black females and white females students who have graduated with no problems," and that the Valedictorian of another class at the Fire Academy in 2005 was a woman. (*Id.,* Ex. A P 20).

## C. COM's Evidence as to Herndon's Reasons for Leaving COM

COM asserts that the summary judgment evidence shows that Herndon left the Fire Academy not because of harassment or discrimination, but because she simply could not keep up, academically or physically. According to COM, Herndon's "short but tumultuous tenure at the Fire Academy [wa]s replete with problems with her performance[,] . . . her attitude, and her attendance." (*Id.* at 2). She was unable **[*37]** "to meet the demanding physical requirements of the program" and earned failing grades on her first three written exams. (*Id.*). Herndon was often tardy for class and refused to or was physically unable to participate in certain of the required physical activities. (*Id.* at 4). COM asserts that "Herndon was a confrontational student who, because of her attitude, was not well liked by most of the other students in the class." (*Id.* at 2). During Miles's investigation after Herndon's departure from COM, one of Herndon's classmates described her as having "started many rumors in the academy" and as being "late all the time." (*Id.,* Ex. C-3 at 1). Another called Herndon a "troublemaker" who "exaggerated [and] took things out of context," and who "tried to get to Mr. Pander all the time." (*Id.,* Ex. C-3 at 2). Yet another reported that Herndon could not "do the skills, could never "remember what she was supposed to do," and boasted that "she had a friend who was a [doctor] and could get a note for her not to participate." (*Id.,* Ex. C-3 at 4).

COM points to the following specific incidents of misconduct or poor performance by Herndon. Except as noted, Herndon has not disputed that these incidents **[*38]** occurred:

. October 7, 2004: Herndon received an Instructor's Warning from Pander for earning a 72% on her second written exam, below the passing grade of 75%, and for being late to class. The form indicated that Herndon was contesting her test score. (*Id.,*

---

from 24 when the school year began in August to 16 by late November 2004 -- and speculated that Keller, who was in his first year as Director, wanted to retain students and "make a good impression." (Docket Entry No. 60, Ex. E at 63).

Ex. A-4).

. October 11, 2004: Herndon had an altercation with a male classmate over putting his book bag on her desk. (*Id.,* Ex. A-1).

. October 18, 2004: Herndon was issued a written Discipline Violation for her conduct in the book-bag incident. The form required Herndon to write a four-page paper titled "Influence of Employee Behavior on the Workplace" and to apologize. Herndon signed the form. (*Id.*).

. October 23, 2004: Instructor Gary Staudt informed Keller that Herndon was unable to perform the required task of pushing a 24-foot ladder onto a simulated roof during a training exercise. (*Id.,* Ex. A-2).

. November 19, 2004: Herndon received an Instructor's Warning from Pander for academic failure. The form noted that Herndon's score on her third written exam was a 75%, bringing her average for the first three exams to a 73.6%, below the minimum passing grade of 75%. (*Id.,* Ex. A-5). Herndon testified that her average was actually 76% **[*39]** but does not cite any evidence such as copies of her exams to support her assertion. (Docket Entry No. 64, Ex. 5 P 14).

. November 20, 2004: Pander sent Keller a memo recommending that Herndon be dismissed for failing grades. Pander cited Herndon's chronic absences and tardiness, inability to perform certain physical requirements, and "rude behavior" such as talking on her cell phone during lectures as additional reasons for dismissal. In the memo, Pander stated that Herndon had told him that "she didn't know what she was getting into" with the program's physical demands. (Docket Entry No. 60, Ex. A-6).

. November 22, 2004: Keller issued Herndon a Dismissal Contract, which was to serve as a "final warning." The contract identified problems with Herndon's academics, attendance, behavior, and skills performance, and stated that failure to meet the required standards in any of these areas would result in dismissal. Herndon signed the contract. (*Id.,* A-7).

. December 6, 2004: Herndon received an Instructor's Warning after being tardy to class on December 3, 2004. (*Id.,* Ex. A-8).

Herndon v. College of the Mainland

. January 22, 2005: Pander informed Keller that Herndon was unable to perform required physical skills in a rescue **[\*40]** class. (*Id.,* Ex. A P 8).

. January 29, 2005: Instructor Mark Allen reported to Keller that Herndon had refused to participate in a group run because it was "too late to run." The run started at 4:32 p.m. and ended around 4:54 p.m. Herndon was issued an Instructor's Warning for leaving class before being dismissed and was assigned a four-page paper on "Physical Fitness in the Fire Service." (*Id.,* Exs. A-9, A-10).

. January 31, 2005: Herndon failed to bring proper bunker gear to class and was unable to participate until a family member brought her gear to her. (*Id.,* Ex. A-11).

. February 14, 2005: Pander told Keller that Herndon had interrupted him three times and then called him a "smart ass" as he was trying to explain to the class how to make up missed work. (*Id.,* Ex. A-12). Classmates also reported that Herndon called Pander a "shithead" that night. (*Id.,* Ex. A-14 at 9-10).

. February 18, 2005: Herndon left class after at least one fellow classmate tied a noose. Herndon had been tardy to class and the instructor, Scott, was out of the classroom writing Herndon up for being late when the incident occurred. (*Id.,* Ex. D P 4).

. February 23, 2005: Miles drafted a Probation Contract for Herndon **[\*41]** that described what Herndon needed to do to complete the Fire Academy. Herndon signed the Probation Contract but dropped out of COM that same day. (*Id.,* Ex. C-2).

COM argues that this record demonstrates that the administrators and faculty "were bending over backwards to try to keep [Herndon] at the Academy," that they exercised "discretion in [her] favor . . . on numerous occasions," and that she left the Fire Academy because she could not keep up, not because of sexual harassment or disparate conditions or treatment. (*Id.* at 2, 21, 24).

Herndon admits to "tardiness and having been absent on occasion" but adds that "this was attributable to her being a mother of two young children" and that the hostile classroom environment "had begun to take a toll on her health." (Docket Entry No. 64, Ex. 5 P 15). She also argues that these violations are pretextual. She asserts that COM "paper[ed] [her] file with excessive write ups and disciplinary notices, disparaging 'witness statements' made by the band of brothers who were actually perpetrating the harassment," because they "realized they were vulnerable" to suit for failing to follow the sexual harassment policy after the book-bag incident. **[\*42]** (*Id.* at 15). She admits to failing to meet some of the physical requirements but asserts that those requirements should have been less demanding than for male students.

### III. The Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *FED. R. CIV. P. 56(c)*. "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 349 (5th Cir. 2005)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *See Celotex, 477 U.S. at 325.* Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)* (citation omitted). "'An issue **[\*43]** is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson, 420 F.3d 532, 536 (5th Cir. 2005)* (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co., 340 F.3d 233, 235 (5th Cir. 2003))*. "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist., 308 F.3d 451, 471 (5th Cir. 2002)* (citing *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (en banc)). When the moving party has met its *Rule 56(c)* burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex.*

Herndon v. College of the Mainland

Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" Little, 37 F.3d at 1075 (internal citations **[*44]** omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted).

## B. Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A school that receives federal funds may be liable for damages under Title IX. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998); Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 383-84 (5th Cir. 2000); Doe v. Lago Vista Indep. Sch. Dist., 106 F.3d 1223, 1225 (5th Cir. 1997). Sexual harassment of a student by a teacher constitutes actionable discrimination for the purposes of Title IX. Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992). Sexual harassment of a student by another student may be actionable discrimination for the purposes of Tile IX if it is "so severe, pervasive, and objectively offensive, and . . . so undermines and detracts from the victim['s] **[*45]** educational experience, that the victim-student[is] effectively denied equal access to an institution's resources and opportunities." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 651, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).

To recover damages for an instructor's sexual harassment of a student or for a student's sexual harassment of another student, the plaintiff must show that 1) an "appropriate person," i.e., an official or employee of the funding recipient with authority to take corrective action to end the discrimination; 2) had actual notice; 3) of harassment "on the basis of sex"; and 4) responded with deliberate indifference. Gebser, 524 U.S. at 290; Davis, 526 U.S. at 648-651; Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002); Doe v. Dallas Indep. Sch. Dist., 220 F.3d at 384. In the case of student-on-student harassment, the plaintiff must also show that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school. Davis, 526 U.S. at 651.

## IV. Analysis

### A. COM's Challenge to Herndon's Summary Judgment Evidence

COM urges this court not to accept as competent **[*46]** summary judgment evidence any part of Herndon's affidavit because it contains several statements that according to Herndon's own deposition testimony are simply untrue. For example, the affidavit asserts that Herndon graduated from the San Jacinto College Fire Academy after she left COM. (Docket Entry No. 64, Ex. 5 P 4). Herndon admitted in her deposition, however, that she withdrew from the San Jacinto College program after completing only one of four required phases. (Docket Entry No. 65, Ex. F at 107-09). Herndon's affidavit also states that after her "graduation" from the San Jacinto College Fire Academy, she "entered the University of Texas Medical Branch pharmacy program," from which she "recently graduated." (Docket Entry No. 64, Ex. 5). Herndon testified in her deposition that she had never participated in the pharmacy program. (Docket Entry No. 65, Ex. F at 111-12).

This court's opinion does not rely on statements in Herndon's affidavit that her own deposition testimony reveals to be untrue. But other parts of the affidavit are not contradicted by her deposition and some are corroborated by other record evidence. Herndon testified in both her affidavit and deposition that her **[*47]** instructors and classmates made sexually inappropriate comments. The Fire Academy Director, Keller, obtained confirmation from one of Herndon's instructors and from the class president that the instructor and Herndon's classmates had, in fact, made inappropriate comments. (Docket Entry No. 60, Ex. A-13). Some details of the "noose incident" described in Herndon's affidavit and deposition testimony were corroborated by her classmates' written reports. (Id., Ex. A-14). And Herndon's account of her final night at COM is largely corroborated by the testimony of COM's Judicial Coordinator, Becky Miles. (Id., Ex. C PP 7-9). Other statements in Herndon's affidavit are neither contradicted in her deposition nor corroborated by other evidence.

Case 4:17-cv-01957 Document 8-1 Filed on 10/27/17 in TXSD Page 14 of 25
Page 14 of 25
Herndon v. College of the Mainland

To the extent COM asks this court to disregard Herndon's entire affidavit, the request is denied. The statements that her own deposition flatly contradict are disregarded. (Docket Entry No. 64, Ex. 5 PP 4, 5). To disregard other parts of the affidavit would require a credibility judgment that is inconsistent with the standards to be applied in deciding summary judgment motions. *See Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 479 (5th Cir. 2008)* ("In **[*48]** reviewing the evidence at summary judgment, [courts] must 'refrain from making credibility determinations or weighing the evidence.'") (quoting *Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007))*.

### A. The Sexual Harassment Claim

For the purpose of its summary judgment motion, COM does not dispute that the harassment alleged by Herndon was "on the basis of sex." COM argues that it did not receive "actual notice" of the harassment until Herndon talked to Miles, Spiller, and Poindexter on February 21, 2005, just a few days before she left the Fire Academy. COM acknowledges that Herndon presented summary judgment evidence that she complained about harassment before that date to the Fire Academy's Director, Keller, and to her instructors, Pander and Scott. COM argues that Keller, Pander, and Scott lacked the supervisory authority necessary to provide actual notice to COM under Title IX. COM also argues that because Herndon alleged that Keller, Pander, and Scott were themselves involved in the harassing conduct, complaints to them could not have provided actual notice to COM under Title IX. COM further argues that the evidence does not show that Herndon's complaints to **[*49]** Keller, Pander, and Scott provided notice under Title IX because Herndon did not file a formal report under COM's sexual harassment policy. (Docket Entry No. 60 at 10-18).

COM also argues that Herndon has not raised a fact issue as to deliberate indifference. COM argues that the evidence shows that its response to Herndon's complaint of harassment was reasonable as a matter of law. (*Id.* at 12). As to the final element under Title IX, COM asserts that the evidence shows that the harassment was not so severe as to have deprived Herndon of access to the educational opportunities or benefits COM provided. (*Id.* at 24-25).

Herndon responds that the evidence raises fact issues as to whether COM had actual notice of the harassment from the time she first complained to her instructors and

as to whether the response was deliberately indifferent. Herndon asserts that she left the Fire Academy because she was frustrated with COM's response to her repeated complaints and because she panicked after her classmates left her alone in a burning building. Herndon saw that incident -- of which she alleges she complained to her instructors but received no response -- as another instance of COM's deliberate **[*50]** indifference to the hostile environment to which she was exposed. (Docket Entry No. 64, Ex. 5 PP 18, 20).

COM's grounds for seeking summary judgment, and Herndon's responses, are examined below.

### 1. Actual Notice under Title IX

COM argues that the persons to whom Herndon allegedly complained about sexual harassment before February 21, 2005 -- Keller, Pander, and Scott -- could not provide actual notice to COM under Title IX. "[T]he express remedial scheme under Title IX is predicated upon [actual] notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser, 524 U.S. at 290* (citing *20 U.S.C. § 1682*). "An 'appropriate person'" is:

> an official of the recipient entity with authority to take corrective action to end the discrimination. . . . [A] damages remedy will not lie under Title IX unless an official who at a minimum had the authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.*

"[T]o qualify as a supervisory employee whose knowledge of abusive conduct counts as the district's knowledge, a school official **[*51]** must at least serve in a position with the authority to 'repudiate that conduct and eliminate the hostile environment' on behalf of the school district." *Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 661 (5th Cir. 1997)* (quoting *Nash v. Electrospace Sys., Inc., 9 F.3d 401, 404 (5th Cir. 1993))*. "[T]he knowledge of the wrongdoer himself is not pertinent to the [actual knowledge] analysis." *Gebser, 524 U.S. at 291*.

COM does not dispute that Davenport, Miles, Spiller, and Poindexter were "appropriate persons" to receive actual notice under Title IX. COM argues that Keller, Pander, and Scott were not "appropriate persons"

because they were themselves alleged "wrongdoers," and because Pander and Scott lacked sufficient authority to take corrective action. COM also asserts that even if Keller, Pander, and Scott were appropriate persons, the actual notice requirement would not be satisfied because Herndon did not file a formal complaint under COM's sexual harassment policy.

**a. Keller**

COM asserts that Keller cannot be considered an "appropriate person" because Herndon alleged that Keller "ratified" the harassment by failing to stop it and by participating with Pander to build what Herndon **[\*52]** asserts was a pretextual record of academic and disciplinary violations against her. (Docket Entry No. 60 at 12). COM points to *Gebser,* which makes clear that notice to a "wrongdoer" cannot provide the basis for actual knowledge to a funding recipient under Title IX. But the "wrongdoer" in *Gebser* was the harasser. The same is true in the other cases COM cites for this proposition. *See Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 610 (8th Cir. 1999)*; *Rubio v. Turner Unified Sch. Dist. No. 202, 475 F. Supp. 2d 1092, 1099 (D. Kan. 2007)*; *Benefield v. Bd. of Trustees of Univ. of Al. at Birmingham, 214 F. Supp. 2d 1212, 1226 n.28 (N.D. Ala. 2002)*. Here, there is no evidence in the record, and Herndon does not assert, that Keller ever sexually harassed her.

The case law under Title IX provides no basis for concluding that a school official with the requisite supervisory authority cannot provide actual notice to the school if that official did not allegedly participate in the sexual harassment but allegedly failed to stop it or even tried to conceal it. *See Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1248 (10th Cir. 1999)* (school officials who allegedly "had actual knowledge" **[\*53]** of harassment "from almost the moment it began to occur, and not only refused to remedy the harassment but actively participated in concealing it" could be "appropriate persons" for Title IX liability); *Montgomery v. Indep. Sch. Dist. No. 709, 109 F. Supp. 2d 1081, 1099 (D. Minn. 2000)* (concluding that the defendant "stretches the Supreme Court's holdings in *Gebser* beyond recognition" in arguing that a teacher who failed to stop the alleged harassment could not supply actual notice). The rule COM urges could make a Title IX claim more difficult to prove, because a school supervisor who learned of, but failed to stop, harassment could not provide actual notice to the school. COM's argument does not provide a basis for concluding that, as a matter of law, Keller was not an

"appropriate person" under Title IX.

COM has not argued that Keller was not an "appropriate person" on any other basis. The cases make clear that notice of harassment to a school principal, university dean, or department chair "entrusted with the responsibility and authority normally associated with th[ose] position[s]" can be "actual notice" to an "appropriate person." *Bostic v. Smyrna Sch. Dist., 418 F.3d 355, 360 (3d Cir. 2005)*; **[\*54]** *see also Davis, 526 U.S. at 633-35*; *Gebser, 524 U.S. at 291*; *Warren v. Reading Sch. Dist., 278 F.3d 163, 169-70 (3d Cir. 2002)*; *Morse v. Regents of the Univ. Of Colo., 154 F.3d 1124, 1128 (10th Cir. 1998)*; *Frederick v. Simpson Coll., 149 F. Supp. 2d 826, 837 (S.D. Iowa 2001)*; *see also J.M. v. Hilldale Indep. Sch. Dist. No. I-29 of Muskogee County, Okla., No. Civ. 07-367, 2008 U.S. Dist. LEXIS 57098, 2008 WL 2944997, at \*6 (E.D. Okla. July 25, 2008)* ("Case law supports the proposition that on-site school administrators . . . qualify as 'appropriate persons' in Title IX cases."). Keller was the Director of COM's Fire Academy. Keller had the authority to discipline students for violations of "academic standards," "attendance standards," "skills performance," and "behavior standards," including "disruptive and threatening behavior." (Docket Entry No. 60, Exs. A-7, A-15). He had the authority to recommend that COM remove students from the Fire Academy, and the record shows that COM acted on his recommendations. (*Id.*). The record does not, however, indicate whether Keller had similar -- or any -- disciplinary authority over Fire Academy instructors. In particular, the record does not show whether Keller had the authority **[\*55]** to "address the alleged discrimination [by the instructors] and to institute corrective measures on [COM's] behalf." *Gebser, 524 U.S. at 290*. There is at a minimum a fact issue as to whether Keller had the requisite authority to be an "appropriate person" to receive notice under Title IX on behalf of COM of teacher-on-student harassment complaints.

**b. Pander and Scott**

COM argues that Pander and Scott were not "appropriate persons" to provide actual notice under Title IX because Herndon accused them of directly participating in the sexual harassment she experienced. To the extent that Pander and Scott themselves are accused of harassing Herndon, they cannot as a matter of law be "appropriate persons" under the statute. The cases make clear that "the knowledge of the wrongdoer himself is not pertinent to the [actual knowledge]

Herndon v. College of the Mainland

analysis." *Gebser, 524 U.S. at 291*; *Kinman, 171 F.3d at 610*; *Rubio, 475 F. Supp. 2d at 1099*; *Benefield, 214 F. Supp. 2d at 1226 n.28*.

Whether the summary judgment evidence shows that Pander and Scott were not "appropriate persons" to receive actual notice of Herndon's student-on-student harassment complaints is less clear. The case law does not provide a clear answer. **[\*56]** For example, in *Davis, 526 U.S. at 644*, a school principal and two teachers had notice that the plaintiff was being sexually harassed by other students. The Court concluded that the actual notice requirement was satisfied. The Court did not clarify whether that was because the principal had been told or because the teachers' knowledge provided an independent basis for establishing actual notice. *526 U.S. at 644-48*. The Court did state, however, that a school may be liable for student-on-student harassment in circumstances "wherein the recipient [of the notice] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id. at 645*. [10] As discussed below, the cases show that whether an instructor can be an "appropriate person" to receive notice of peer harassment under Title IX is a fact-intensive determination, in which a court should consider the instructor's role in the school's disciplinary structure and the extent of the instructor's role in administering student discipline and imposing other corrective action.

In *Hawkins v. Sarasota County School Board, 322 F.3d 1279, 1286 (11th Cir. 2003)*, the Eleventh Circuit stated that "the issue of whether notice to a teacher constitutes actual notice on the part of a school" remains "open,"

---

[10] The *Davis* dissent understood the majority's actual-notice standard as opening the door to actual notice premised on a teacher's **[\*57]** knowledge. The dissent worried that the standard could have "bizarre implications":

> In the context of teacher harassment, the *Gebser* notice standard imposes some limit on school liability. Where peer harassment is the discrimination, however, it imposes no limitation at all. In most cases of student misbehavior, it is the teacher who has authority, at least in the first instance, to punish the student and take other measures to remedy the harassment. The anomalous result will be that, while a school district cannot be held liable for a teacher's sexual harassment of a student without notice to the school board (or at least to the principal), the district can be held liable for a teacher's failure to remedy peer harassment.

*526 U.S. at 679-80* (Kennedy, J., dissenting).

but that the proper approach was a fact-specific inquiry into the details of the instructor's position and authority. "In order to answer the question, it would be necessary to examine how Florida organizes **[\*58]** its public schools, the authority and responsibility granted by state law to administrators and teachers, the school district's discrimination policies and procedures, and the facts and circumstances of the particular case." *Id.* Similarly, in *Murrell v. School District No. 1, 186 F.3d at 1248*, the Tenth Circuit concluded that the inquiry would necessarily be fact-intensive but that "teachers may well possess the requisite control necessary to take corrective action to end the discrimination" if they exercised control over the harasser and the context in which the harassment occurred." The court stated:

> We decline simply to name job titles that would or would not adequately satisfy this requirement. '[S]chool districts contain a number of layers below the school board: superintendents, principals, vice-principals, and teachers and coaches, not to mention specialized counselors such as Title IX coordinators. Different school districts may assign different duties to these positions or even reject the traditional hierarchical structure altogether.' Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is **[\*59]** necessarily a fact-based inquiry.

*186 F.3d at 1247* (quoting *Rosa H., 106 F.3d at 660*). The court reversed the district court's grant of the defendant's motion to dismiss, concluding that "[a]t this stage in the proceedings we must accept as true the allegation that [the plaintiff's] teachers were invested with the authority to halt [the defendant's] known sexually assaultive behavior." *Id.* [11]

Other courts have reached similar conclusions. A California district court held, in denying a motion to dismiss, that "[a]lthough later in these proceedings it might be established that [the plaintiff's teachers] lacked authority meaningfully to address [the male students'] harassing conduct, the court concludes that, read in the light most favorable to [the plaintiff], the [complaint] alleges the teachers had such authority." *Annamaria M. v. Napa Valley Unified Sch. Dist., No. C 03-0101, 2006 U.S. Dist. LEXIS 38641, 2006 WL 1525733, at \*4 (N.D.*

---

[11] The *Murrell* court also noted, however, that the actual-notice requirement would be satisfied in any case because the record indicated that the plaintiff had also told the school principal. *186 F.3d at 1248*.

Case 4:17-cv-01957   Document 8-1   Filed on 10/27/17 in TXSD   Page 17 of 25
Page 17 of 25
Herndon v. College of the Mainland

*Cal. May 30, 2006)*. In *Montgomery v. Independent School District No. 709, 109 F. Supp. 2d at 1099*, **[\*60]** the court denied summary judgment on the defendant's Title IX claim, concluding that there was at least a fact issue as to whether the plaintiff's teachers were "appropriate persons" for the purpose of receiving actual notice under Title IX. The court noted that "[b]ecause teachers ordinarily maintain at least some level of disciplinary control over their students, it is reasonable to infer that they had authority to take disciplinary action and to institute other corrective measures to end the harassment." *Id.* The court emphasized the fact that the school's sexual harassment policy required teachers to report harassment to the school principal. "[T]he teachers had the authority to take at least this minimal corrective measure which, if effectively carried out, would impart knowledge of the harassment to higher School District officials with even greater authority to act." *Id.* [12]

Cases involving **[\*62]** an instructor's knowledge that a student is being harassed by another instructor provide additional insight into the factors to be considered. [13]

---

[12] These cases are consistent with Title IX guidelines published by the United States Department of Education's Office for Civil Rights, which are promulgated to guide funding recipients in fulfilling their Title IX obligations. *See* U.S. Dep't of Ed., Office for Civil Rights, REVISED SEXUAL HARASSMENT GUIDANCE: **[\*61]** HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES (January 2001) ("OCR Title IX Guidelines"). In *Davis, 526 U.S. at 647-68*, the Supreme Court cited with approval a previous, similar version of the OCR Title IX Guidelines. The Guidelines state that an appropriate person can "include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." OCR Title IX Guidelines at 13. The Guidelines definition is, however, based on a "knew, or in the exercise of reasonable care should have known," standard, which is not the more restrictive "actual notice" standard required by *Davis* and *Gebser*. The Guidelines recognize that the "actual notice" standard imposed by the courts, but state that "[c]onsistent with its obligation under Title IX to protect students . . . OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination." *Id.* at 33 n.73.

[13] It is not clear from the record whether Herndon informed Pander that Scott was harassing her, or whether she informed Scott that Pander **[\*63]** was harassing her. Herndon testified

Deciding if an instructor is an "appropriate person" in these cases depends in large part on whether, and to what extent, that instructor exercises control over the instructor accused of harassment. In *Frederick v. Simpson College, 149 F. Supp. 2d at 837*, the court found that professors who served as assistant dean and chair of the accused professor's department were "appropriate persons" to receive actual notice of the accused professor's alleged harassment of a student because both had positions of oversight and "h[ad] the authority to discipline the professor." *Id.* The associate dean "had broad authority to address problems and institute corrective measures," and the department chair "had authority within her department to intervene at some level to stop harassment if she knew it was occurring." *Id.* Their "responsibilities required them to be more than a colleague or friend to" the accused professor. *Id.*

An instructor with no disciplinary authority over another instructor who is accused of harassment is less likely to be considered an "appropriate person." In *Liu v. Striuli, 36 F. Supp. 2d 452, 466 (D. R.I. 1999)*, the court concluded that a university director of financial aid and director of the graduate history department were not "appropriate persons" to receive actual notice of a modern languages professor's allegedly harassing conduct. These directors did not supervise the accused professor and were not "official[s] who had the authority to police relationships between faculty and doctoral students." *Id.* The directors "had no power to discipline or even to question [the professor] about the relationship." *Id.* [14] Similarly, in *Litman v. George Mason University, 131 F. Supp. 2d 795, 799-800 (E.D. Va. 2001), rev'd on other grounds, 92 F. App'x 41 (4th Cir. Feb. 25, 2004)*, the court concluded that a professor who was merely a colleague of the accused could not be an "appropriate person" because there was no evidence in the record that the **[\*64]** professor "had supervisory authority over the harasser, such that he could have directly taken corrective action to cure the problem." *Id. at 799.* [15]

---

generally that she "continually" informed her instructors of harassment. (Docket Entry No. 64, Ex. 5 P 11).

[14] The court also concluded that the directors had no actual notice of harassment because the record did not show that the directors understood the relationship between the accused professor and the plaintiff doctoral student to be anything but consensual. *Liu, 36 F. Supp. 2d at 466.*

[15] The emphasis on disciplinary structure and authority in

Herndon v. College of the Mainland

Other cases are consistent. In *Warren v. Reading School District, 278 F.3d 163, 173 (3d Cir. 2002)*, the court vacated a jury verdict for the plaintiff and remanded for new trial, concluding that the district court should have instructed the jury that, as a matter of law, a school guidance counselor with no authority to discipline the accused teacher could not be an "appropriate person." *Id.; see also Nelson v. Lancaster Indep. Sch. Dist. No. 356, No. Civ. 00-2079, 2002 U.S. Dist. LEXIS 3093, 2002 WL 246755, at *5 (D. Minn. Feb. 15, 2002)* (school teacher was not appropriate person to receive actual notice of school bus driver's alleged harassment of student because teacher was not "capable of terminating or suspending the individual"); *but see Doe v. Norwalk Cmty. College, No. 3:04-cv-1976, 2007 U.S. Dist. LEXIS 51062, 2007 WL 2066496, at *4 (D. Conn. July 16, 2007)* (finding a triable issue of fact as to whether a colleague of the accused community **[*66]** college professor could be an "appropriate person").

The cases do not make clear whether an instructor's obligation under a sexual harassment policy to report harassment, in absence of other supervisory or disciplinary authority, creates a sufficient degree of control for the instructor to be considered an "appropriate person." The court in *Montgomery, 109 F. Supp. 2d at 1099*, suggested that it could, concluding that the teachers' obligation under the school policy to report evidence of sexual harassment to the principal demonstrated that teachers "had the authority to take at least this minimal corrective measure which, if effectively carried out, would impart knowledge of the harassment" to the principal. But the *Montgomery* court appeared to be influenced in part by the fact "teachers ordinarily [also] maintain at least some level of

_____

these cases is consistent with pre-Gebser case law in the Fifth Circuit. In *Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d at 660*, the court held that "a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so." *Id. at 660*. The court concluded that this rule "omit[s] the bulk of employees, such as fellow teachers, coaches, and janitors, unless the district has assigned them both the duty to supervise the employee who has sexually abused a student and also the power **[*65]** to halt the abuse." *Id.; see also Canutillo Indep. Sch. Dist. v. Leija, 101 F.3d 393, 402 (5th Cir. 1996)* (fellow teacher of alleged harasser who "did not have any authority over [the harasser] or other authority, including to take the requisite remedial action," was not an "appropriate person").

disciplinary control over their students." *Id.* The court in *Litman, 131 F. Supp. 2d at 799-800*, held that an instructor's reporting obligations under the school's policy could not create the requisite degree of supervisory control, concluding that even though the alleged harasser's colleague had a policy obligation (that he failed to fulfill) to report **[*67]** the harassment, this obligation was insufficient to make the professor an "appropriate person" for the purpose of finding that the school had actual notice. Similarly, in *Liu, 36 F. Supp. 2d at 466*, the court held that a professor's duty to report harassment was not "authority to take corrective action because the report itself could not have ended the discrimination."

The record in this case indicates that Pander and Scott were vested with at least some authority to discipline students and implement measures to respond to complaints of student misconduct. COM has attached numerous disciplinary notices issued by Pander and Scott. These notices reveal that the instructors had the ability to issue warnings, give writing assignments as punishment for infractions, and recommend students' dismissal from the Fire Academy. (Docket Entry No. 60, Exs. A-4, A-5, A-6, A-8, A-10, A-11, A-12, A-16). COM's sexual harassment policy at least arguably required Pander and Scott to report complaints they received of "not minor" sexual harassment to the Title IX coordinator. (*Id.*, Ex. A-1 ("All reports of sexual harassment that are not minor shall be referred to the Title IX Coordinator.")). On the other **[*68]** hand, Herndon testified that Keller almost never accepted the dismissal recommendations that Pander made, which may call into question Pander's authority to address behavior in the classroom and to institute corrective measures. (*Id.*, Ex. E at 63). There is a fact issue as to whether Pander and Scott "exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]." *Davis, 526 U.S. at 645*. Summary judgment cannot be granted based on a finding that as a matter of law Pander and Scott were not "appropriate persons" under Title IX.

### c. The Effect of Herndon's Failure to Follow the Sexual Harassment Policy Before February 21, 2005

COM argues that actual notice cannot be established on the basis of Keller's, Pander's, and Scott's knowledge because Herndon did not file a formal complaint under COM's sexual harassment policy until February 21, 2005. There is summary judgment evidence that Keller suggested in October 2004 that she file such a complaint. COM's policy stated that "[a] student who has

Herndon v. College of the Mainland

a complaint alleging sexual harassment . . . *may* request a conference with the Title IX coordinator." (*Id.*) (emphasis added). The policy also imposed an **[*69]** obligation to report complaints to the Title IX coordinator, an obligation that, on its face, is not restricted to the student making the complaint. The policy stated that "[*a*]*ll* reports of sexual harassment that are not minor shall be referred to the Title IX Coordinator . . . . Oral complaints shall be reduced to writing . . . ." (Docket Entry No. 60, Ex. A-1) (emphasis added). COM's sexual harassment policy could reasonably be read as imposing an obligation on faculty and administrators who received a student complaint of not minor sexual harassment to refer that complaint to the Title IX coordinator. That the policy states that a student "may" speak directly with the Title IX coordinator but does not require the student to do so strengthens the inference that the reporting obligation extends to persons other than the complaining student. There is at least an issue as to whether Keller, Pander, and Scott failed to comply with the policy.

Moreover, a complainant's failure to follow a formal sexual harassment complaint procedure is not dispositive in a Title IX case. "[U]nder *Gebser* and its progeny, an aggrieved student or employee need not follow the institution's official route for **[*70]** reporting sexual harassment. She must merely report to someone with authority to take corrective measures." *Crandell v. N.Y. College of Osteopathic Med., 87 F. Supp. 2d 304, 321 (S.D.N.Y. 2000).* Herndon reported the alleged harassment to Pander, Keller, and Scott, and there is at least a fact issue as to whether these individuals had the authority to take corrective measures.

In any event, the Title VII cases that COM cites in support of its argument that the policy is dispositive are distinguishable. In *Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir. 1999),* the plaintiff not only failed to follow the sexual harassment policy but also "never alerted anyone at AutoZone to [her supervisor's] inappropriate activities" before she quit her job. Here, there is no dispute that Herndon did report the harassment. In *Durkin v. City of Chicago, 341 F.3d 606, 613 (7th Cir. 2003),* the plaintiff "never expressed her feelings of harassment or offered any specific examples of what she considered harassing or demeaning conduct. Instead, she complained about matters that were not sexual in nature . . . The ubiquitous nature of her complaints did not shed light upon the abusive behavior or demoralizing **[*71]** feelings she was experiencing." In the present case, Herndon specifically reported conduct that was sexual in nature. The *Durkin*

court also noted that a failure to follow a formal sexual harassment policy is not necessarily fatal provided the plaintiff levied other complaints that could "put [the] employer on notice," which the plaintiff had not done in that case. *Id.* In the present case, there is summary judgment evidence that precludes the conclusion that as a matter of law, Herndon has failed to meet the statutory notice requirement.

In *Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1294 (11th Cir. 2000),* another case that COM cites, the sexual harassment policy required that individuals experiencing sexual harassment "*must* bring this to the attention of appropriate persons in Company Management," explaining that harassment would be "virtually impossible to detect unless *the person being harassed* registers his or her discontent with the appropriate company representative." (emphasis added). COM's policy does not unambiguously place the reporting obligation squarely or exclusively on the student. In *Madray,* the court concluded that the mid-level managers to whom the plaintiff **[*72]** had complained had not received adequate notice because her complaints were too vague. *Id. at 1300-01.* COM has not argued that the notice Keller, Pander, or Scott received was insufficiently clear or vague to convey that sexual harassment was taking place. Herndon's failure to file a formal complaint until February 2005 is not dispositive.

COM's summary judgment motion cannot be granted on the basis of its argument that as a matter of law, it lacked actual notice of the harassment Herndon alleges.

## 2. Whether COM Acted With Deliberate Indifference

COM also seeks summary judgment on the basis that as a matter of law, it responded to Herndon's complaints in a manner that was not "clearly unreasonable."

"'[T]he deliberate indifference standard is a high one.' Officials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Doe v. Dallas Indep. Sch. Dist., 220 F.3d at 384* (internal citations omitted) (quoting *Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 219 (5th Cir. 1998); Farmer v. Brennan, 511 U.S. 825, 844, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).* A plaintiff can establish deliberate indifference "only where the funding **[*73]** [recipient's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."

Herndon v. College of the Mainland

*Davis, 526 U.S. at 648*. [16] "This is not a mere 'reasonableness' standard." *Id. at 649*. The funding recipient is obligated only to respond "in a manner that is not clearly unreasonable." *Id.* Title IX does not give the victims of peer harassment the right to make "particular remedial demands." Courts are to "refrain from second-guessing the disciplinary decisions made by school administrators." *Id. at 648*.

*Davis* involved a fifth-grade male student who fondled a fifth-grade student's breasts, told her "I want to get into bed with you" and "I want to feel your boobs," placed a door stop **[*74]** in his pants, and acted in a sexually suggestive manner. *Id. at 633-34*. Although both the plaintiff and her mother informed the plaintiff's teacher about the incidents, the school took none of the following actions: disciplining the student, separating the plaintiff from the student, or establishing a sexual harassment policy or procedure. *Id.* When the plaintiff's mother asked the principal what disciplinary action he planned to take against the student, he responded "I guess I'll have to threaten him a little bit harder." *Id. at 635*. The Supreme Court stated that this lack of response could suggest "deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment." *Id. at 654*.

COM does not argue, and there is no evidence in the record to indicate, that Pander and Scott took any action in response to the complaints they allegedly received from Herndon. It is clear that when an "appropriate person" makes "no effort whatsoever either to investigate or to put an end to the harassment," *Davis, 526 U.S. at 654*, that person has acted with deliberate indifference.

The parties agree that Herndon complained to **[*75]** Keller about sexual harassment on at least two occasions. [17] The first such notice was on October 11,

_____

[16] The OCR Title IX Guidelines describe a funding recipient's appropriate response to known sexual harassment:

> Once a school has notice of possible sexual harassment of students . . . it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.

OCR Title IX Guidelines at 15.

[17] Herndon also testified that she told Keller about the incident

2004, after the book-bag incident. Herndon told Keller that she thought one fellow classmate was sexually harassing her by asking her out repeatedly, even after she said no. (Docket Entry No. 60, Ex. A P 5). Keller received the second such notice on February 15, 2005, when Herndon complained about the hostile classroom environment. Keller's investigation in February revealed that Pander and Herndon's classmates had made inappropriate comments. Shortly after this investigation, Keller learned of the noose incident, which occurred on February 18, 2005. (*Id.,* Ex. A-13).

The parties do not dispute that Keller's response to the complaint after the book-bag incident in October 2004 was to give Herndon a copy of COM's sexual harassment **[*76]** policy and tell her to "feel free to take any action necessary to address [her] concern[s]." (*Id.,* Ex. A-1). COM argues that this precludes a finding of deliberate indifference because "Keller gave [Herndon] the name of the person to talk to about sexual harassment in October if [she] truly believed she was being harassed." (*Id.* at 15). But it is not clear that supplying Herndon with a copy of the policy was "not clearly unreasonable." "[U]nder *Gebser* and its progeny, an aggrieved student or employee need not follow the institution's official route for reporting sexual harassment. She must merely report to someone with authority to take corrective measures." *Crandell, 87 F. Supp. 2d at 321*. COM agrees that Keller had such authority. In *Litman v. George Mason University, 131 F. Supp. 2d at 803*, the court denied the defendant university's motion for summary judgment, rejecting the argument that it had not been deliberately indifferent because the plaintiff had made no formal written report under the school's sexual harassment policy. "The Court [w]as troubled by GMU's apparent position that [the plaintiff's] mere failure to follow the university's own policy that complaints be in writing **[*77]** -- which is *not* a Title IX requirement -- essentially relieved it of its obligation to conduct a full investigation into her allegations," of which the university conceded it had notice. *Id.* COM's sexual harassment policy, which appears to require instructors receiving student complaints of harassment to report the complaints to the Title IX coordinator, is another factor. The case of *Doe v. Norwalk, 2007 U.S. Dist. LEXIS 51062, 2007 WL 2066496, at *4*, involved a similar situation. In that case,

_____

in which her classmates allegedly left her alone in a burning building. (Docket Entry No. 64, Ex. 5 P 19). Keller testified that he did not receive any notice beyond the October 2004 book-bag incident and the February 2005 hostile environment and noose incidents. (Docket Entry No. 60, Ex. A P 10).

Herndon v. College of the Mainland

the professor in whom the plaintiff had confided about suffering sexual harassment from another professor "urged" the student to tell the college dean and crafted a plan with the student to "deflect" the harassing professor's advances, but did not follow the policy requiring professors receiving such reports to relay them to a superior. The school moved for summary judgment on the basis of an absence of deliberate indifference. The court concluded that there was "an issue of fact as to whether the school's policy . . . render[ed] [the professor's] response inadequate under Title IX." *Id.* [18] Similarly, Keller had an obligation under COM's policy to refer "not minor" harassment to the Title IX coordinator. The record as **[*78]** to Keller's decision in October 2004 merely to give a copy of the sexual harassment policy to Herndon, given the disputed issues as to other complaints she had made and the continuing harassment she suffered, are insufficient to conclude that, as a matter of law, that the response was "clearly not unreasonable."

Keller's response to Herndon's February 15, 2005 report of a hostile classroom environment was more extensive. He contacted Pander and the class president, Jason Cox, to ask about Herndon's complaints. Cox and Pander both reported that Pander and Herndon's classmates had made "inappropriate comments." (Docket Entry No. 60, Ex. A-13). Pander admitted using terms like "raghead," and "stupid fuckers." (*Id.*). Keller responded by giving Herndon's class one hour of "Firefighting Professionals" training, in which the class "discussed the importance of respect to individuals regardless of our differences," and touched upon

_____

[18] This is not to say that supplying a student with a sexual harassment policy cannot be part of a reasonable response to harassment. In *Hayut v. State University of New York, 352 F.3d 733, 751-52 (2d Cir. 2003)*, the plaintiff reported harassment by a professor to the university dean. The dean discussed the plaintiff's complaint with her for one hour, and advised her to meet with the chair of the harassing professor's department and to file a written complaint under the university's sexual harassment policy. The dean did not wait for the student's written complaint (which she did not file for another two months) to take action. Instead, the dean contacted the department chair independently about the student's complaint and organized a meeting of college officials to discuss the professor's conduct. *Id. at 752.* The court affirmed the district court's grant of summary judgment **[*79]** to the defendant university, concluding that "through the actions of its officials," the university had "acted expeditiously and reasonably, and exhibited no indifference at all" to the plaintiff's allegations. *Id. at 752.*

"discrimination, disparaging terms, sexual harassment, and how jokes can divide a team." (*Id.*). Herndon testified that Keller's conduct of the event led her to believe that he did not take her complaints seriously. (*Id.,* Ex. E at 53). The noose incident occurred just two days later. (*Id.,* Ex. A-13). Keller testified that he told his supervisor at COM, **[*80]** Cissy Matthews, about the noose incident on February 19, 2005. (*Id.,* Ex. A P 15, Ex. A-13). The record does not indicate that Miles, Spiller, or Poindexter, or COM's Title IX coordinator, Pamela Davenport, learned of Herndon's harassment complaints until February 21, 2005. The record does not indicate that Keller relayed his findings about the conduct of Pander and Herndon's classmates to these individuals.

Poindexter and Miles promptly investigated and met with Herndon on the evening of February 21, 2005. (*Id.,* Ex. C P 4). According to Miles, Herndon wanted "Mr. Pander to agree to stop using inappropriate comments" and to "get something in writing in his file to that effect." Miles talked to Keller and Pander, obtained Pander's agreement to this arrangement, and wrote a note for Keller to put in Pander's file. (*Id.,* Ex. C PP 4, 5, Ex. C-4). Miles informed Herndon of Pander's agreement on February 23, 2005. (*Id.,* Ex. C P 6).

There is no evidence that Herndon's sexual harassment complaint was reduced to writing, as COM's sexual harassment policy requires. (*Id.,* Ex. A-1). Miles considered the issue "resolved" to Herndon's satisfaction on February 23, 2005, but Herndon left the Academy **[*81]** that day. (*Id.,* Ex. C P 8). Miles did not read the students' handwritten accounts of the noose incident or interview Herndon's classmates until February 28, 2005, five days after Herndon's departure from the Fire Academy. (*Id.,* Ex. C P 10). Herndon disputes that she told Miles that she was satisfied with the note in Pander's file. Herndon testified that Miles seemed more interested in discussing Herndon's academic problems and disciplinary violations than investigating Herndon's harassment complaints, and only addressed the harassment issue on February 21, 2005 after first reviewing the severity of the infractions in Herndon's academic file. (Docket Entry No. 64, Ex. 5 P 20). On February 23, 2005, Miles asked Herndon to sign a Probation Contract that enumerated each of Herndon's violations. (Docket Entry No. 60, Exs. C P 6, C-2). Herndon testified that she was frustrated with the meeting and COM's response and resigned from the Fire Academy the same evening. (Docket Entry No. 64, Ex. 5 P 20).

Herndon v. College of the Mainland

A funding recipient has not acted with deliberate indifference simply because an "investigation could have been more thorough." *Frederick v. Simpson College, 149 F. Supp. 2d at 840*. In *Frederick,* **[\*82]** the court granted summary judgment to the defendants on the issue of deliberate indifference, despite finding that investigative procedures employed were "subpar" and "bordering on negligence." *Id.* The school's investigation consisted of a prompt interview with professor accused of harassing the plaintiff student. The school issued a three-page report, reporting that it had resolved the situation by telling the professor "to avoid vulgar and suggestive language in the classroom, and that it was not advisable to meet with students in private settings such as a vehicle in a parking lot." *Id. at 833*.

In the present case, however, the record, including the disputes as to when COM received actual notice of the harassment, precludes summary judgment on the basis that the response was sufficient as a matter of law to avoid liability under Title IX. Herndon's evidence, viewed in the light favorable to her for purposes of summary judgment, includes evidence that beginning in the fall of 2004, she was subjected to frequent harassment from students and, to a lesser extent, instructors, despite her complaints and protests. Placing a note in Pander's file and obtaining his agreement to refrain from **[\*83]** inappropriate remarks in February 2005 is not a sufficient basis for summary judgment given the record evidence of the sources, extent, and duration of harassment and of Herndon's complaints.

### 3. Whether the Harassment Deprived Herndon of Access to the Educational Opportunities or Benefits Provided by COM

In cases of student-on-student harassment, recovery under Title IX is not permitted unless the plaintiff demonstrates that the harassment experienced was so "severe, pervasive, and objectively offensive that it c[ould] be said to deprive the [student] of access to the educational opportunities or benefits provided by the school." *Davis, 526 U.S. at 650*. COM argues that Herndon left COM not because of harassment but because "she knew she was about to fail a test" and that she would have been dismissed from the Fire Academy for falling short of the academic and skills requirements. (Docket Entry No. 60 at 25). Herndon counters that she left out of "frustration" over COM's response to her sexual harassment complaints, which focused on Herndon's own academic infractions, and out of fear, when classmates left her alone in a burning

building during a simulated house fire and Pander failed **[\*84]** to take any action to discipline them. (Docket Entry No. 64, Ex. 5 PP 18-20). Herndon argues that at least some of her academic and performance problems resulted from the harassment, in two ways. She alleges that the disciplinary write-ups were excessive and were in retaliation for the complaints she made. She also testified that she suffered an ulcer and stress-related illness because of the harassment, and that these health issues negatively impacted her attendance and grades. (Docket Entry No. 60, Ex. E at 116; No. 64 PP 14-15).

The case law shows that evidence such as stress-related illness, stomach problems, falling grades, or a student's withdrawal from the school due to fear of harassment can constitute harassment sufficiently severe to deprive the student of an educational benefit. *See Theno v. Tonganoxie Unified School Dist. No. 464, 377 F. Supp. 2d 952, 968 (D. Kan. 2005)* (the plaintiff suffered from stomach problems and depression requiring prescription medication and eventually left his high school); *Montgomery v. Indep. Sch. Dist., 109 F. Supp. 2d at 1094* (the plaintiff was afraid to participate in school activities and eventually transferred to a different school); *Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp. 2d 332, 357 (W.D. Pa. 2008)* **[\*85]** (the plaintiff experienced a drop in attendance and grades). There is sufficient evidence in the record to create an issue of fact as to whether the harassment was sufficiently severe to have deprived Herndon of an educational opportunity. Whether Herndon left COM because of harassment or because she knew she was going to fail is disputed. COM's motion for summary judgment on Herndon's Title IX sexual harassment claims is denied.

### B. Sex Discrimination

Herndon also alleges sex discrimination. Such discrimination is cognizable under Title IX if it consists of the intentional exclusion from participation in, denial of the benefits of, or discrimination under any education program or activity receiving federal financial assistance. *See Pederson v. Louisiana State Univ., 213 F.3d 858, 877 (5th Cir. 2000)*. Herndon asserts that some of the Fire Academy's physical performance requirements, which were applied equally to men and women, had a disparate impact on women. She makes a similar claim about COM's policy of not providing toilets at burn drills, arguing that although both men and women had to urinate in bushes or behind trees, the fact that women had to expose the lower parts of their

Herndon v. College of the Mainland

bodies **[\*86]** to do so was discriminatory. COM responds to the disparate impact claims by pointing out that "what the Plaintiff is suggesting is that the College should have accommodated her gender by letting her do things differently than the male students," and argues that "Plaintiff can show no legal authority that Title IX requires a school to accommodate a person's gender in non-athletic situations; it simply prohibits differential treatment." (Docket Entry No. 60 at 23).

Herndon also makes what appears to be a disparate treatment claim, arguing that she was penalized more harshly than the men in her class for similar infractions. COM responds to the disparate treatment claim by pointing to numerous instances of Herndon's male classmates receiving similar or more stringent punishments for the same infractions that Herndon committed. (*Id.* at 20-22).

## 1. The Training Requirements

Herndon cites no authority for the proposition that a disparate impact claim may be brought under Title IX. In *Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)*, the Supreme Court concluded that Title VI, *42 U.S.C. § 2000d*, on which Title IX is patterned, prohibits only *intentional* discrimination. *Id. at 280-81*. Although Title **[\*87]** VI provides for the promulgation of regulations enforcing the statute, *42 U.S.C. § 2000d-1*, and the regulations prohibit conduct having a disparate impact, *28 C.F.R. § 42.104(b)(2)*, the Court concluded that the statute had no "rights-creating language" and therefore did not permit a private remedy. *532 U.S. at 288-93*. The Court concluded that the plaintiff, who claimed that Alabama's English-only driving exam had a disparate impact on non-English speaking test takers, had no private cause of action under Title VI. *Id. at 279, 293*. The Court emphasized that Title IX "'was patterned after Title VI'" and contains "'parallel language.'" *Id. at 280* (quoting *Cannon v. Univ. of Chicago, 441 U.S. 677, 694, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979))*. Subsequent cases have interpreted *Sandoval* as requiring proof of intentional discrimination to support a cause of action under Title IX, *20 U.S.C. § 1681*, which is virtually identical to *§ 2000d*, and as precluding a private right of action based on regulations promulgated under *20 U.S.C. § 1682*, which is virtually identical to *§ 2000d-1*. *See, e.g.*, *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 361 U.S. App. D.C. 257, 366 F.3d 930, 946 (D.C. Cir. 2004)* (observing that *Sandoval* precludes a disparate impact **[\*88]** claim under Title IX).

The Fifth Circuit has not considered a disparate impact claim under Title IX since *Sandoval*, but the Circuit's prior holdings are consistent with *Sandoval*. In *Fort v. Dallas Indep. Sch. Dist., 82 F.3d 414, 1996 WL 167072, at \*3 & n.3 (5th Cir. Mar. 11, 1996)* (unpublished), the court held that "to establish a claim under Title IX, the plaintiff must establish that an educational institution receiving federal assistance intentionally discriminated on the basis of the plaintiff's sex." (citing *Chance v. Rice Univ., 984 F.2d 151, 153 (5th Cir. 1993))*. The court noted that the requirement of discriminatory intent imposes a higher burden of proof on a plaintiff than disparate impact. *82 F.3d 414, Id. \*3 n. 3.*

Under *20 U.S.C. § 1681(b)*:

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that **[\*89]** sex in any community, State, section, or other area.

*20 U.S.C. § 1681(b)*. The statute contains only one exception: "[T]his subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex." *Id.* There is no basis for a disparate impact claim under Title IX.

Even if a disparate impact claim could proceed under Title IX, Herndon's claim would fail because she has not made a *prima facie* showing. Under Title VII, "[t]o establish a prima facie case of discrimination under a disparate-impact theory, a plaintiff must show: (1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *McClain v. Lufkin Indus., Inc., 519 F.3d 264, 275-76 (5th Cir. 2008)*. The second element, a "disparate effect," requires "a specific practice or set of practices resulting in a significant disparity between the groups." *Barrow v. Greenville Indep. Sch. Dist., 480 F.3d 377, 382-83 (5th Cir. 2007)*. **[\*90]** This showing generally requires "evidence of . . . observed statistical disparities," *id. at 383*, but may include anecdotal evidence, *Wakefield v.*

Herndon v. College of the Mainland

*State Farm Ins., 229 F.3d 1148, 2000 WL 1239170, at *5 (5th Cir. 2000)* (unpublished). In the present case, Herndon has not offered statistical or other evidence that any other women in the Fire Academy were unable or less able than men to comply with the physical requirements that COM imposed on both men and women. Keller testified to the contrary that COM "h[as] had black females and white female students who have graduated with no problems," and that the Valedictorian of another Fire Academy class in 2005 was a woman. (Docket Entry No. 60, Ex. A P 20). Herndon has not made a *prima facie* showing that COM's training requirements had a disparate impact on women. COM is entitled to summary judgment on Herndon's claim that the training requirements were discriminatory and violated Title IX.

## 2. The Absence of a Toilet at the Burn Drills

Herndon fails to raise a fact issue as to discrimination based on COM's failure to provide toilets at burn drills. The Seventh Circuit considered a similar issue in *DeClue v. Central Illinois Light Co., 223 F.3d 434 (7th Cir. 2000)*. **[*91]** The female plaintiff worked as a lineman in a mostly-male electric company crew. She sued under Title VII, alleging a hostile work environment based on physical and verbal harassment and her employer's failure to provide toilet facilities at outdoor worksites. The plaintiff had "unsuccessfully sought corrective action," such as "the installation of some sort of toilet facilities in the linemen's trucks." *Id. at 436*. The court concluded that the plaintiff's allegation of the absence of toilet facilities did not support a hostile environment claim and would be cognizable, if at all, as a disparate impact claim. The court explained:

> The plaintiff has insisted on litigating her case as a hostile-work-environment case throughout. But it is not. Sexual harassment is the form of sex discrimination in the terms or conditions of employment that consists of efforts either by coworkers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to women . . . . It is a form of, rather than a synonym for, sex discrimination. It is remote, for example, from a simple refusal to hire women, from holding them to higher standards than their male coworkers, **[*92]** or from refusing to make accommodations for differences in upper-body strength or other characteristics that differ systematically between the sexes. The last is the classic disparate-impact claim, and it is the claim

suggested by the facts of this case but not presented by the plaintiff.

*Id. at 437*. The court observed: "We need hardly add that women are not 'unreasonable' to be more sensitive about urinating in public than men; it is as neutral a fact . . . as the fact that women's upper-body strength is on average less than that of men, which has been held in disparate-impact litigation to require changes in job requirements in certain traditionally male job categories." *Id. at 436*.

As in *DeClue,* Herndon's complaint about the lack of a toilet at burn drills cannot proceed as a hostile work environment claim. No Fire Academy students had access to a toilet during burn drills. Herndon has not asserted, and there is no evidence in the record, that her male classmates watched or otherwise harassed female students who had to urinate at burn drills. Although Herndon's complaint could raise a disparate impact claim, such a claim is not cognizable under Title IX. COM is entitled to summary **[*93]** judgment on the claim that the lack of toilet facilities at the burn drills was sex discrimination in violation of Title IX.

## 3. Disparate Discipline

Herndon asserts that COM disciplined her more harshly than her male classmates who committed similar infractions. She identifies only one instance. On January 31, 2005, she received a write-up for forgetting to bring her bunker gear to class, while another male student who also forgot was not written up. (Docket Entry No. 64 at 17). COM submitted as evidence an Instructor's Warning that Pander issued to a male student for forgetting his bunker gear on January 31, 2005. (Docket Entry No. 60, Ex. A-16 at 7). COM has also attached numerous other records of warnings, and one dismissal, issued to Herndon's male classmates.

A disparate treatment claim is cognizable under Title IX and follows the Title VII framework. *Gossett v. Okla. ex rel Bd. of Regents for Langston Univ., 245 F.3d 1172, 1176 (10th Cir. 2001)*. To state a *prima facie* case for disparate treatment in the form of disparate discipline, a student who is a member of a protected class must show that other students not in the protected class were "treated differently under circumstances **[*94]** 'nearly identical' to [the student's]." *Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1090 (5th Cir. 1995)* (quoting *Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991))*. COM has rebutted the only instance of disparate

Herndon v. College of the Mainland

discipline that Herndon identified and has presented evidence of numerous other instances of discipline applied to men and women for similar offenses. COM is entitled to summary judgment on the disparate discipline claim.

**V. Conclusion**

COM's motion for summary judgment on Herndon's Title IX hostile-environment sexual harassment claim is denied. COM's motion for summary judgment on Herndon's Title IX sex discrimination claims is granted.

The Supreme Court has just issued an opinion on the relationship between Title IX and *42 U.S.C. § 1983*, holding that Title IX is not an exclusive remedy. *Fitzgerald v. Barnstable Sch. Comm., -- U.S. --, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009)*. A scheduling conference is set for **February 27, 2009, at 9:00 a.m.** in Courtroom 11-B.

SIGNED on February 13, 2009, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United States District Judge