### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **JANE DOE,** | § | |
| | § | |
| *Plaintiff,* | § | **C.A. No. 4:17-cv-1957** |
| | § | |
| **V.** | § | |
| | § | |
| **PRAIRIE VIEW A&M** | § | |
| **UNIVERSITY and** | § | |
| **PAUL JOHNSON** | § | **(JURY TRIAL DEMANDED)** |
| *Defendants.* | § | |

## PLAINTIFF'S AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Jane Doe, (hereinafter "Jane" or "Plaintiff") filing this her Amended Complaint against Defendants Prairie View A&M University (hereinafter "Prairie View University" or "the University") and Paul Johnson, and in support thereof would show as follows:

## I.      PRELIMINARY STATEMENT

**Plaintiff's suit against Prairie View**

This is a lawsuit charging Defendant Prairie View University with intentionally subjecting Plaintiff to a sexually charged atmosphere wherein she faced sex discrimination, sexual harassment, sexual assault and retaliation for attempting to resist same. This lawsuit further speaks to Defendant's deliberate indifference and

2

retaliation in response to Plaintiff's complaints of sex discrimination, sex harassment, sexual assault and retaliation.

Plaintiff's lawsuit describes Defendant's failure to promptly and appropriately investigate and respond to her complaints and it highlights Prairie View's mindset concerning its female students, like Plaintiff, who are subjected to sex discrimination and harassment and report same. Rather than address the unlawful discrimination and harassment, Prairie View University turned a blind eye to Plaintiff's experience leaving her to fend for herself.

Prairie View's mindset and failures promotes an environment where students' chances of being sexually discriminated against, harassed, assaulted, and/or retaliated against for standing up against such unlawful conduct substantially increases.

Moreover, Prairie View's failure to promptly and appropriately investigate and respond to Plaintiff's complaints fostered a hostile, retaliatory environment for Plaintiff, effectively denying Plaintiff access to educational opportunities for which she has paid for and aspired toward her entire life.

Unlike most Plaintiffs alleging Title IX violations, Plaintiff's case is unique because she has a college-student relationship and had an employer-employee relationship with Prairie View at the time of the unlawful acts. As a student, she was subjected to sexual harassment that affected her education and educational opportunities. As an employee, she was subjected to sexual harassment that affected

the terms and conditions of her employment. Her injuries, while similar, are separate and distinct under Title IX and Title VII.

**Plaintiff's suit against Paul Johnson**

Plaintiff also pursues a claim of sexual assault against Paul Johnson, the former Prairie View employee who wrongfully sexually assaulted her while she was a student-worker working under him in Prairie View's Agricultural and Research Center (A&R Center). Plaintiff's Amended Complaint alleges violations of Title IX and Title VII. This action also alleges a pendent claim arising under state law for negligence against Prairie View. In support thereof, Plaintiff would show the Court as follows:

## II.        JURISDICTION, PARTIES AND VENUE

1.      This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Plaintiff brings this action against Prairie View to redress the sexually hostile educational environment to which it subjected her pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a). This action is also brought against Prairie View pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), to address the sexually hostile work environment to which Defendants subjected Plaintiff.

3.      Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. 1367(a) to hear and decide claims arising under state law, as set

forth in Plaintiff's Amended Complaint, including Plaintiff's claim against Defendant Prairie View University for negligence and against Paul Johnson for sexual assault

4.      Venue is proper in this district pursuant to 28 U.S. C. §1391(b), because all Parties reside in this district and the events giving rise and the employment practices alleged to be unlawful herein were committed within the Southern District of Texas, Houston Division.

5.      Plaintiff Jane Doe is a female. At all material times Jane Doe was living in Harris County, Texas.  At the time of events complained of herein, Jane Doe was a student attending Prairie View A&M University and was also an employee of the University.

6.      Defendant Prairie View University is an educational institution and employer located in Waller County, Texas.  Prairie View University has made an appearance and may be served through its counsel of record.

7.      Defendant Paul Johnson is an individual employed by Prairie View and will be served where he is found.

8.      During all material times to Plaintiff's Amended Complaint, Prairie View University received federal funding for its academic programs and activities as contemplated by Title IX, 20 U.S.C. 1681, *et seq.* for its activities including financial aid and research grants.  Moreover, at all times material to this Amended Complaint, Prairie View University's A&G Center was federally funded and able to provide

5

employment for Prairie View University students by and through the federal funds it received.

## III.     FACTS

9.      Jane Doe (female) is currently 22 years old.  She is the mother of one young child who is currently 4 years old.

10.     Jane applied and was accepted into Prairie View University in the fall of 2012 as an engineering student-major.  Jane, however, waited until the spring of 2013 to enroll into the University due to the birth of her daughter in 2012.

11.     In the spring of 2013, Jane started her college education at Prairie View University paying for tuition through scholarships and other forms of financial aid assistance.

12.     Jane's lawsuit claims are based on events occurring during her third year at the University; Jane was 20 years old at that time.

**Jane meets Paul Johnson at an off-campus event.**

13.     On October 3, 2015, during Jane's junior year, Jane attended an off-campus social event/banquet—unrelated to the University or its functions—with her aunt. During the event, Jane and her aunt were introduced to a man named Paul Johnson ("Johnson").  Johnson was extremely friendly to Jane and even asked if she wanted to dance with him.  Jane declined.

14.     Toward the end of the banquet,  Johnson invited Jane and her aunt to go

6

back stage and take photos with the artists who had performed that evening. Jane and her aunt accepted Johnson's invitation.

15.     Afterwards, Johnson told Jane, "take my number down, I would love to keep in contact with you ladies." Jane entered Johnson's phone number in her aunt's cellular phone not her own.

16.     A few days after the banquet, Johnson telephoned the number that Jane had provided to him but instead of reaching Jane, Johnson reached Jane's aunt. During their telephone call, Johnson told Jane's aunt that he worked at Prairie View University. Naturally, Jane's aunt mentioned in response that, Jane, her niece attended the University as a student.

17.     Johnson also told Jane's aunt that he had a position available at the University to hire a student. Johnson asked Jane's aunt to let Jane know about the employment opportunity.

18.     At that time, Jane was unemployed and desperately searching for an on-campus student position, so she was very excited when her aunt shared the news about a possible employment opportunity at the University.

19.     To Jane's surprise, on October 7, 2015, Johnson went a step further and sent her a Facebook friend request. Through Facebook, Johnson asked Jane to come by his office in the College of Agricultural & Research Center.

20.     Interested in the potential job, Jane reported to Johnson's office on

7

October 12, 2015 and met with Johnson for about an hour and a half.

21.     During the meeting, Johnson told Jane that the job required some technical background and that it would be a great opportunity for Jane because she was an engineering student-major. Johnson provided Jane with the position number of the job to apply for it online and told her it was a job under the Capacity Building Grant funded by the United States Department of Agriculture and the National Institute of Food Agriculture.

22.     Upon information and belief, the job that Johnson offered Jane was only available to Prairie View University undergrad or graduate students. Outsiders could not apply for it; only students like Jane.

23.     During the meeting, Johnson also complimented Jane several times, told her that she was beautiful and that he would love for her to work with him. Before Jane left the meeting, Johnson told Jane that the job was hers if she wanted it.

24.     In line with Johnson's instructions, Jane applied for the job using the position number Johnson provided, turned in her paperwork and was given a start date of Monday, November 9, 2015 to begin working as Johnson promised.

**Using federal funds, Johnson gives Jane a student-worker job at the University**

25.     On November 9, 2015, Jane started her job with Johnson at the University. During her very first week of employment, Johnson told Jane that it was an easy job and that all she had to do to maintain it was to do what he asked of her,

8

which he described as "satisfying him and making him happy."

26.     Later that same day, while Jane was in  Johnson's office, two men entered and, upon seeing Jane, one of the men exclaimed, "Oh, nice  Johnson! I am going to have to borrow her."  Johnson replied, "No, no she's mine, get your own." The man replied, "It's okay; we can all take turns." The three men burst into laughter.

27.     Jane excused herself and walked out of  Johnson's office. While waiting in the hallway for the men to leave, Jane heard one of the men ask  Johnson, "Are you hitting that?" And,  Johnson reply, "No, not *yet*." The man replied, "goddam, that's a nice piece of ass you got all to yourself."

28.     Jane was shocked. She felt degraded and objectified by the men but never thought that  Johnson would really try to cross any lines with her, physically. Additionally, she desperately needed the job to help support her daughter (whom she had recently regained custody of) and to be able to continue to attend school, so Jane determined to continue working for  Johnson.

29.     Initially, Jane was right.  The first two days of work,  Johnson was extremely nice to Jane and seemed to extend himself to Jane in an effort to gain her trust.  Johnson told Jane that she could confide in him about anything. In turn, Jane would often vent to  Johnson about school and how much she missed her home state of New York and her family there. Jane also confided in  Johnson about the not-so-distant domestic abuse she suffered at the hands of her daughter's father.

9

**The unwanted touching begins/sex discrimination**

30.     By the end of the first week,  Johnson started hugging Jane when she arrived to work. He started by only hugging Jane around her waist.  Johnson then progressed to fondling Jane's buttocks when he hugged her.

31.     When this unwanted touching began to occur, Jane felt trapped, conflicted, and outraged. She believed that she was indebted to  Johnson because he had given her a job that she so desperately needed but she also felt outraged that Johnson would place her in such a tenuous and undesirable position.

32.     Confused, conflicted and distraught, Jane did not immediately verbally object to  Johnson's *hugs*.  Instead, she stayed silent but stiff in fear of losing her job. When he hugged her, she did not reciprocate by extending her arms around his waist but did not push away from him in fear that she would anger him

33.     By the second week of work,  Johnson started telling Jane things like: "God put me in your life for a reason" and that she could only understand what he wanted from her if she were on a higher intellectual level. In other words,  Johnson tried to manipulate Jane into silence.  Jane often spoke to Johnson about her Christian faith.  This caused Jane even greater turmoil as her Christian principles taught her to forgive others and to turn the other cheek.  Johnson was masterful at using Jane's relationship with God and his alleged relationship with God to get her to accept what he was doing.

10

34.     And Jane did indeed stay silent. She needed her job, and knew that Johnson could take it from her as easily as he had given it to her -- he had made that clear during the very first week of Jane's employment.

**Sexual Assault**

35.     On Tuesday November 17, 2015, when Jane reported to work at Johnson's office,  Johnson closed and locked the door behind her. When Jane sat down in a seat facing  Johnson's desk,  Johnson said, "I can't have a hug?"

36.     Jane needed her job and felt compelled to comply, so she allowed Johnson to hug her but when Jane proceeded to sit back in the seat where she had initially been seated,  Johnson signaled her to a chair next to his.

37.     When Jane sat down,  Johnson placed Jane's hand on his penis, which was erect. Johnson then said, "It doesn't bite" and stood up in front of Jane.  Johnson then pulled out his penis and began touching himself.

38.     Jane sat in silence and fear and looked out the window, which was in the direction opposite to  Johnson. Unbothered,  Johnson grabbed Jane's chin and turned Jane's head to face him positioning his penis in her face.

39.     He told Jane "it's simple all you have to do is open your mouth." Jane did not want to perform oral sex on  Johnson but then he put the tip of his penis on Jane's mouth and Jane knew he wouldn't let her leave until she did.

40.     Jane opened her mouth and  Johnson pushed his penis inside of it.

11

When it was over, Jane left his office, went to the restroom and sobbed in humiliation of what had happened.

41.     Jane didn't report to work for the remainder of the week but returned to work on Monday, November 23, 2015.

42.     When Jane reported to work,  Johnson greeted Jane with a hug and asked Jane about her weekend. Jane responded that it was okay, and Johnson replied, "You were amazing!" (referring to the event that took place the week before).

43.     Humiliated, Jane got up and ran to the computer lab in tears. Approximately ten minutes later,  Johnson found Jane and asked her if she was okay. When Jane replied, no; he told Jane to come back to his office and talk to him.

44.     In  Johnson's office,  Johnson told Jane that she was like a ***daughter*** to him and that she could talk to him about anything that was bothering her. Emotionally distraught and humiliated, Jane remained quiet.

45.     Thereafter, Jane continued to report to work but  Johnson's harassment and assault had completely overwhelmed and consumed her. Jane found herself sporadically crying. She also started to gain excessive weight, and she found it difficult to concentrate in her classes. Jane's education suffered horribly because of Johnson's harassment and assault.

46.      Johnson did not force Jane to engage in oral sex again but he would grab Jane's buttocks, touch her breasts and touch Jane in other inappropriate ways.

He would also make Jane touch him by grabbing Jane's hand and forcing her to touch him in inappropriate sexual ways.

47.     Johnson would also show Jane sexual pictures and videos on his MAC computer. When he would touch Jane, he would say things like, "I'll wait until you're ready to give up that fat young pussy."

48.     Johnson would also tell Jane about his personal sexual fantasies and past sexual experiences each time she reported to work. Johnson specifically expressed his infatuation with the innocence of young woman and boasted that his wife was 20 years younger than him.

49.     Johnson would tell Jane about sexual things he wanted Jane to do to him and about different women who had given him oral sex.  On one occasion Johnson even told Jane about another student worker about whom he had sexual fantasies. He also admitted that he had reported that same student to an administrative assistant for her attire because of the sexual fantasies he was having about the student. Johnson also admitted that after his complaint, he returned to his office to relieve himself (sexually).

50.     These are the kind of discussions and conduct Jane was forced to endure while working with  Johnson at the University.  This is not what Jane expected to have to endure for a job at Prairie View University.

 __Johnson's winter-break plans__.

13

51.     By this time, the semester was ending and winter break was approaching. Johnson told Jane that he wanted Jane to work with him during winter break because most faculty, staff and students would be out on break.  He told Jane that, with the faculty and students away, he would have an opportunity to be alone with Jane to have **sex** with her.

52.     In response, Jane began looking for excuses to avoid working during the break.  She told  Johnson that at the last minute her grandparents had surprised her with tickets to NYC to visit them and that she wouldn't be able to work after all. This was not true.

53.      Johnson didn't get upset with Jane because he too found out that he would not be available during winter break because his brother in Jamaica had died, and he needed to go to Jamaica to bury him.

54.     As such, Jane and  Johnson had no interactions during winter break.

**Spring semester with  Johnson**

55.     When school resumed and the spring semester began, the same sexually inappropriate behaviors from  Johnson continued.

56.     Around this same time, Jane had met a graduate student who was interested in her. At times, Jane would ask her male friend to walk with her to her job so that  Johnson would think she was in a relationship and would, hopefully, stop sexually harassing her.

14

57.     (Naïvely) Jane believed that if Johnson saw (or thought) that she was seeing someone, he would stop his sexual requests and behaviors but he didn't; in fact, it only made the situation worse.

58.     On a few occasions, after seeing Jane with her male friend, Johnson would pin Jane against the wall with her back facing him and whisper in her ear "Are you fucking him?" "All he wants from you is sex, and once he gets what he wants he'll be done with you." All while sliding his hand on her body.

59.     There were occasions when Johnson even confronted Jane's male friend and told him that he was Jane's <u>boss</u> and Jane was <u>his</u> student worker. Johnson even gave Jane's friend a spiel about his educational background when all Jane's friend was doing was walking Jane to work and/or dropping lunch off for Jane on occasion.

**<u>Jane breaks down</u>**

60.     During spring break Jane broke her leg and missed almost 2 weeks of work. During that time, Johnson would call Jane and tell her that he missed her. He would also text Jane.

61.     By this time, however, Jane's spirit was broken and she was mentally and physically distraught. Jane had made it up in her mind that enough was enough and that she would no longer silently comply with Johnson's sexual overtures.

62.     During this time, Jane was extremely emotional and many of her friends questioned her wellbeing. Jane's graduate, male friend who had seen Johnson in

15

action knew something was not right and he asked Jane a few times what was going on with her boss. He also told Jane, "your boss likes you and he's too involved in your personal life and that's unprofessional."

63.     Jane knew that this was true but she was an emotional wreck. At random moments throughout the day she would start crying and, at other moments, she would simply be angry about what was going on and what  Johnson had put her through. She also worried frantically about her job and her financial wellbeing if Johnson took it from her.

64.     For the first time ever, Jane was failing her classes at the University.

65.     Consequently, Jane made up her mind to tell  Johnson that he could not continue to use her for sexual favors and that she was emotionally distraught because of his conduct.

66.     When Jane told  Johnson, he became upset and told Jane that she could not keep working for him without making him happy!

67.     In line with his word, almost immediately  Johnson started to reduce Jane's work hours.

68.     On April 5, 2016 Jane decided to complain to Eric Risch, Johnson's immediate supervisor about her reduced hours. She told Risch that  Johnson was being unprofessional toward her by reducing her hours without valid reason but Jane made no specific mention of the sexual harassment she had been enduring.

16

69.     In response to Jane's complaint, Risch set up a meeting with Jane, himself and Johnson, wherein Johnson stated that he had no issues with Jane and that he would allow her to work if he had hours and/or work for her to do.

70.     After the meeting, however, Jane's work environment with Johnson spiraled downhill fast and hard. Johnson apparently believed that Jane had reported his sexual harassment and inappropriate sexual conduct to Risch; but Jane had not <u>yet</u> done so;[3] she had only voiced her complaints directly to Johnson at this point in time..

71.     Moreover, Johnson did not want to work with Jane if he was not giving into his sexual requests.

72.     After the meeting between Risch, Johnson and Jane, Johnson became openly hostile and rude toward Jane and continued to cut her hours. He subjected her to a hostile work environment.

73.     Jane determined that she would <u>have</u> to tell Risch about the sexual harassment she had endured by Johnson and the retaliation she was now facing because she would no longer acquiesce.

74.     On or about April 12, 2016, Jane reported to Risch that Johnson had subjected her to sexual harassment since she first started working with him and that she believed that Johnson was cutting her hours because she had demanded that the

_____

[3] Early on when Johnson started to sexually harass Jane, he made Jane promise not to tell anybody what happened between them. He also told her that if she ever did, nobody would believe Jane and no penalty would be brought against him because that's the way "PV" operates.

sexual harassment and sexual touching stop.

75.    Jane told Risch everything. She told him about  Johnson sexually touching her and that during her entire employment with  Johnson she believed that her job was in jeopardy if she didn't acquiesce to his sexual requests and talk.

76.    Jane told Risch that since she had told  Johnson that she would no longer acquiesce, he had subjected her to a hostile work environment and retaliation. Jane told Risch that since she told Johnson that she would not acquiesce to his sexual demands, Johnson had started to reduce her hours and dock hours that she had worked.

77.    In response, Risch asked Jane **not** to report  Johnson because "Jane would not want something like that on [her] conscience." He told Jane he wasn't surprised about the harassment however he was shocked that all of it took place in Johnson's "tiny office," and then chuckled.

78.    Risch also told Jane that Johnson had been a friend of his for about 20 years and that he would talk to him about her hours. Risch assured Jane that contrary to Jane being fearful about losing her job, she would not and that he would right Johnson's wrongs by paying Jane out of his own pocket if it meant making the entire situation disappear.

79.    Risch also told Jane that if she cost Johnson his job, she would face consequences later in her life. Risch also told her that if Jane reported Johnson's

18

assault against her, Johnson's wife and son would be affected.

80.     Unbelievably, he also told Jane, "You know what; I bet you really wish that  Johnson would bend you over his desk. It's okay, I will tell him just screw her before she makes our lives a living hell because that's what she really wants."

81.     Jane left Risch's office dismayed.  While she genuinely hoped that things would improve, Risch seemed only to belittle her and her complaints of sexual harassment and retaliation.

82.     While she was not looking to jeopardize  Johnson, Jane wanted to be able to work and attend school in a harassment free environment and work her job without having her hours reduced and facing retaliation.

83.     However, even after the April 12th meeting, Johnson's retaliatory behavior toward Jane continued.  Johnson was simply in retaliation mode and he believed he was untouchable. He continued to treat Jane in a hostile manner, and he continued to cut her work hours.

84.     Next,  Johnson removed Jane from the project she was assigned to work, hired a new student worker and told Jane she couldn't work in the A&R Center anymore because he didn't have any more funding in his USDA grant budget to employ her. This was simply not true. Johnson also denied Jane summer employment, which he had previously promised her.

85.     After  Johnson told Jane that she could not have any more hours, he

19

then hired two more students from the College of Engineering for the summer and fall semesters of 2016.

86.    Jane reported the continued retaliation to Risch on or about April 29, 2016 and Risch again told Jane he had known  Johnson for almost 20 years, that Johnson was a good man and that he (Risch) would fix it. Risch also told Jane that filing a report would not only negatively affect  Johnson but it would also affect the innocent members in  Johnson's family and Risch attempted to persuade Jane that she would not want that on her conscious. To dissuade Jane from further reporting Johnson, Risch told Jane:

- Let's not destroy the entire village to get to one person;
- Don't burn any bridges (by reporting Johnson);
- You go to church, don't you?
- A strong person would turn the other cheek;
- I will override Johnson docking your hours;
- My boss doesn't know about this and he doesn't have to know:
- If we go one step up, we lose control;
- You hope to get a job here next year, right?
- Johnson may lose his job:
- Do you think that you are the first person to be ill-treated?; you are not the first person or the last;
- If you respect my judgment, it will work out for you;
- When I was a new employee at Prairie View and thought I was God's gift to creation, I told the Dean that I didn't have time for a meeting, and in response, the dean "fixed me." He did not give me a raise for 4 years;
- Sometimes it's better to keep your mouth shut than say anything;
- I'm like a priest;
- Johnson doesn't know how much I know;
- Forgive your trespassers.

20

87.     Indeed, rather than report Johnson's gross and unlawful conduct, Risch suggested that he set up another meeting with Jane, himself and Johnson to discuss Jane's hours and employment. Ultimately, Johnson and Risch's end goal was to keep Jane quiet regardless of what she had endured. Like Johnson, Risch used Jane's religious beliefs to manipulate her into being silent.

88.     Although Jane agreed to another meeting, after the second group meeting, still nothing change. Her hours remained minimal and Johnson continued to treat her rudely.  At this point Jane felt helpless. What is more, reporting the sexual harassment did nothing to stop the nightmare Jane was facing.

89.     Jane's entire school life was falling apart and she was also suffering financially.  Jane decided to confide in her graduate school friend about some of what she was dealing with.

90.     Thankfully, Jane's friend told Jane that she should report everything.  He also directed her to the proper department to report her complaints.

91.     On that same day, May 19, 2016, Jane reported   Johnson's sexual harassment and unlawful sexual conduct to the University's EEO/Title IX office.

92.     Jane reported to the University's Title IX coordinator (A. Taylor), that she had been sexually harassed and assaulted by  Johnson and that she was facing a hostile work and school environment and retaliation after asking  Johnson to stop his

21

sexual touching of her and reporting Johnson's misconduct to Risch.

93.     When Jane made her report to Taylor, she was hesitant because she was scared of further retaliation, she was scared to betray Johnson after promising not to report him and the harassment, and she was scared that no one would believe her like Johnson had threatened.

94.     At 20-years old and lacking a lot of maturity and experience that an older person has acquired, Jane felt incessantly indebted to Johnson because of the employment opportunity he had initially provided her. She also felt sympathetic that Johnson had a son battling sickle cell anemia and a wife who often underwent medical operations. Jane cared that Johnson had a family that depended on him financially. Additionally, the manipulation of Johnson and Risch in cleverly using Jane's Christian faith to remain silent and forgive also weighed heavily on her.

95.     However, during her report to the University's Title IX coordinator, Jane mentioned Johnson's name and the Title IX coordinator responded, "Johnson? Short, bald head with an accent." When Jane responded, "yes," the Title IX coordinator announced, "sadly, this isn't the first, second or third complaint I've received involving Johnson. You see this file cabinet (she touched a tall beige file cabinet against the wall in her office), it's full of complaints reported at this University and somewhere in there is a folder with Johnson's name on it."

96.     Confused, Jane responded "Why is he still here, why was he given

22

another opportunity to violate someone else?" The Title IX coordinator said "Sadly, it happens all too often here at Prairie View, if it were up to me, they would be out of here but it's not, unfortunately. My job is only to investigate the complaint, report and submit my findings for review at the Texas A&M systems office."

97.     During Prairie View's investigation, Johnson denied inappropriate contact and/or sexual contact with Jane and Risch denied that Jane had made a complaint of sexual harassment to him against Johnson.  According to Risch, if she did, "I tuned her out."

98.     Ultimately, the Title IX coordinator's prediction was correct. The University did nothing about Jane's complaint for months although its own policy required a response to Jane's complaint within 15 business days.  Rather, Jane- now jobless – continued to suffer as a result of the sexual ordeals and misconduct that Johnson had subjected her to.

99.     Jane did poorly in her classes and suffered through irreparable humiliation, embarrassment, loss of self-worth and dignity at the hands of  Johnson, and then felt invisible when the University refused to adequately address her pleas for help.

100.     **Three months** after her complaint, the University sent Jane a letter in response to her complaints that contained one substantive sentence:   "Your allegations concerning  Johnson were unsubstantiated."

23

101.    With that, the University blatantly denied Jane's complaints were valid and ended their investigation.

102.    Not only did the University engage in a substandard and untimely investigation of Jane's complaints, shortly following the University's conclusion, Jane began experiencing further retaliation.

103.    She received anonymous calls threatening her about her having made a complaint against Johnson. Jane reported these calls to the University and the University police.

104.    Prairie View also failed to maintain confidentiality of Jane's complaint and as a result, several University employees openly questioned Jane (K. Redmon), chastised Jane, laughed at Jane, and humiliated Jane about being sexually harassed by Johnson and complaining about it.

105.    Within 2 months of Jane's complaint to Prairie View about its failure to maintain the integrity and confidentiality of its investigation into Jane's sexual harassment and assault complaints, Prairie View University subjected Jane to unjustified scrutiny and discipline in further retaliation for Jane's Title IX/Title VII complaints.

106.    That is, without reasonable justification, Prairie View University placed Jane on "Conduct Probation" on or about November 28, 2016, and then increased its discipline toward her to a suspension on March 8, 2017. Ultimately, however, Prairie

24

View was forced to rescind its unjustified discipline against Jane in the face of its groundless position.

107.   Indeed, Jane has experienced the most inhumane forms of harassment and retaliation by the University as a result of her protected complaints. It has resulted in her failing and/or dropping classes and being constructively and literally forced out of the University.  Her education opportunities have been severely limited.

108.   Even currently (fall semester 2017)—although Jane was able to fight her March 2017 suspension and return to school—Prairie View University has continued to make attending its institution horrific for Jane in retaliation for her steadfast complaints.

109.   Faculty members and professors at Prairie View with knowledge of Jane's complaints, shun her and treat her rudely. Dr. Yang, for example, who—prior to Jane's Title IX and Title VII complaints to Prairie view had a very collegial relationship with Jane—has completely changed his demeanor toward Jane and blatantly asked Jane, "why are you here?" when Jane reached out to him for educational guidance this semester. Dr. Yang would not invite Jane into his office when she went to him in need of educational assistance; but instead told her that their conversation would need to take place in the hallway. This type of treatment is humiliating and degrading and it is in part the reason that individuals like Jane do not make complaints of sexual harassment/assault.

110.   At all material times, the Defendant was receiving federal funding as contemplated by Title IX for its activities including financial aid and research grants among other sources.

111.   Too, the University implemented and executed policies and customs in regard to the events that resulted in the deprivation of Plaintiff's constitutional, statutory and common-law rights.

112.   The University is responsible for ensuring that all of its employees are properly trained and supervised to perform their jobs.

113.   The University is responsible for the acts and omissions of its employees and agents.

114.   As early as April 12, 2016, the University received a report from the Plaintiff concerning the sexual assault, sexual harassment and hostile work environment she experienced while working at the University.

115.   Following the report, the University failed to adequately investigate Plaintiff's complaints in violation of Title IX. Rather, the University's employee (Risch) tried to keep Jane's sexual harassment and sexual assault completely hush-hush.

116.   Upon information and belief, the University failed to report the criminal acts involved in the report it received from Plaintiff in violation of its obligations under the Cleary Act.

117.    The University failed to provide a safe academic environment for the Plaintiff, and faced with the Plaintiff's and other students' reports of harassment, the University's response, and its officials' conduct, was such that future reasonable students in Plaintiff's circumstances would be chilled from reporting sexual harassment.

118.    Prairie View employees, including high ranking officials, conspired amongst themselves, and with other University employees, with the common purpose of violating Plaintiff's rights in relation to the reports of sexual harassment and misconduct that the Plaintiff provided within a timely manner.

## IV.    CAUSES OF ACTION

### A.    PRAIRIE VIEW'S VIOLATION OF TITLE IX 20 U.S.C. § 1681, *et. seq.*

119.    Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs 9 through 118 above and incorporates them all here as though fully set forth.

120.    The sex-based harassment articulated in this complaint was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities and/or benefits provided by the school.

121.    Prairie View, through its agents, supervisors, or employees created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S. C. §1681 because:

27

a. Plaintiff was  member of a protected class;

b. Plaintiff was subjected to sexual harassment in the form of sexual slurs, touching and assault by a faculty member;

c. Plaintiff was subjected to this harassment based on her sex (female); and

d. Plaintiff was subjected to a hostile education environment created by the Defendant's lack of policies and procedures and/or its custom to ignore its own policies and policies and Defendant's failure to properly investigate and/or address the sexual assault and subsequent harassment.

122.   Prairie View and its officials had actual knowledge of the sexual harassment and sexual assaults beginning in April 2016 but failed to investigate and/or discipline Plaintiff's harasser in a timely manner and consistent with federal and state law.

123.   Prairie View's failure to promptly and appropriately respond to the alleged sexual harassment resulted in Plaintiff, on the basis of her sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in Prairie View's education program in violation of Title IX.

124.   Prairie View failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

125.   Prairie View persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

126.   Prairie View, through  Johnson and others, engaged in a pattern and

practice of behavior designed to discourage, and which did in fact discourage, Jane—who had been sexually harassed and assaulted—from seeking protection and from seeking to have sexual harassment and/or assaults from being fully investigated.

127.   This policy and/or practice constitute disparate treatment of females like Jane and has had a disparate impact on female students in general.

128.   Plaintiff has suffered educational hardships, loss of credits, educational opportunities, work experience beneficial to her education, financial loss, emotional distress, psychological damage, and her character and standing in the community has suffered from the harassment fostered as a direct and proximate result of Prairie View's deliberate indifference to her rights under Title IX.

## B.   PRAIRIE VIEW'S VIOLATIONS OF TITLE VII

129.   Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs 9-118 above and incorporates them here as though fully set forth.

130.   <u>Exhaustion of Administrative Remedies</u>:   Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on or about August 26, 2016.  In that Charge, No. 460-2016-04656 and any amendments thereto, Plaintiff asserted that she was discriminated against because of her sex (female) and faced retaliation for opposing sexual harassment. The EEOC issued Plaintiff her

29

Right to Sue letter dated on August 24, 2017 and mailed it out to Plaintiff on or about August 28, 2017. Plaintiff has exhausted her administrative remedies and files her suit pursuant to Title VII within the statutory deadline.

131.    Prairie View University, through its supervisors and employees, engaged in unlawful sex discrimination by subjecting Plaintiff to unwelcome sexual harassment in violation of Title VII.

132.    The above-described unwelcome sexual harassment created an intimidating, oppressive, hostile and overtly offensive work environment, which interfered with Plaintiff's education, employment and emotional and physical wellbeing.

133.    Prairie View University, through its supervisors and employees, engaged in retaliation against Plaintiff because of her complaints of sex discrimination in the workplace.

134.    Prairie View University at all times relevant hereto had actual and/or constructive knowledge of the conduct described in paragraphs 9 through 118 in large part because of Johnson's supervisory position, Plaintiff's complaint to management, and the open and obvious nature of the sexual misconduct.

135.    As a result of the hostile and offensive work environment perpetrated by Prairie View University, through its supervisors and/or employees, and maintained

by Defendant Prairie View's failure to protect Plaintiff from further harassment, Plaintiff suffered educational setbacks, severe emotional distress and physical injury and financial lost.

136.   As a result of the *quid pro quo* sexual harassment that Prairie View University, through its supervisors and/or employees, subjected Plaintiff to, Plaintiff has suffered educational setbacks, severe emotional distress, physical injury and financial lost.

137.   Defendant Prairie View University violated Title VII by allowing and fostering a sexually charged work environment for Plaintiff.

138.   Defendant Prairie View University violated Title VII by failing to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and omissions of Paul Johnson as described herein.

139.   Defendant Prairie View University violated Title VII by retaliating against Plaintiff, as described above, in response to her complaints of sex discrimination.

140.   Defendant Prairie View University failed to comply with its statutory duty to promptly take all reasonable and necessary steps to eliminate sexual harassment from the workplace and to prevent it from occurring in the future.

141.   As a direct and proximate result of Defendant Prairie View University's

31

willful, knowing and intentional discrimination and retaliation against Plaintiff through its faculty members and/or employees, Plaintiff has suffered and will continue to experience pain and suffering, and extreme and severe mental anguish and emotional distress; she has incurred and/or will incur medical expenses for treatment by psychotherapists and other health professionals, and for other incidental expenses; and she has suffered and/or will continue to suffer educational setback, a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

142.   As a further direct and proximate result of Defendant Prairie View University's violation of Title VII, as heretofore described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendant Prairie View University, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff, who therefore will seek leave of Court to amend this Amended Complaint in that regard when the same shall be fully and finally ascertained.   Plaintiff requests that attorney's fees be awarded pursuant to Title VII.

**C.    TEXAS TORT LAW – Negligent Hiring, Training, Supervision and Retention as to Prairie View University**

143.   Prairie View University owed Plaintiff a duty of reasonable care in the

hiring, training, supervising and retaining its employees.

144.    Defendant breached these duties in multiple ways, including:

e.    Failing to properly hire, train, supervise and retain officers, staff and faculty as to proper methods to deal with reports of sexual harassment, sexual abuse, investigate same and accommodate victims in a manner that would permit them to, without undue hindrance, complete their higher education;

f.    Failing to properly and timely report incidents of claims sexual harassment and/or sexual assault;

g.    Failing to provide adequate counseling an assistance to victims of sexual harassment and/or sexual assault;

h.    Failing to adequately monitor and supervise departments to ensure compliance with protections and standards for sexual harassment and/or sexual assault prevention, reporting and investigation;

i.    Failing to discover, develop and/or implement basic safeguards designed to prevent and/or minimize incidents of sexual harassment and assault;

j.    Failing to properly evaluate, investigate and/or monitor persons accused of sexual harassment and/or sexual assault to ensure additional events do not occur;

k.    Failing to adopt and implement adequate safeguard to prevent known sexual harassment from occurring on campus;

l.    Failing to provide adequate staff, with proper training, to counsel and assist victims of sexual harassment and/or sexual assault;

m.    Failing to adopt education programs to promote awareness of sexual harassment and/or sexual assault;

n.    Failing to adopt and periodically review procedures to make sure they are adequate to address complaints of serious sexual misconduct;

o.    Failing to make the goal of protecting the campus community from sexual assaults and harassment an integral part of the institution's day-to-day mission of providing a safe and secure learning and working environment.

145.    Prairie View, through its agents, supervisors, or employees discriminated

33

against Plaintiff, which led to the loss and impairment in whole or part, of the wages, benefits, promotions, privileges, opportunities and/or terms and conditions of Plaintiff's education and employment.

146.   The above-described acts on Prairie View's part were committed with actual malice and/or in reckless disregard of Plaintiff's federally protected civil rights.

147.   The above-described acts on Prairie View's part caused Plaintiff substantial injury and damage.

D.   **SEXUAL ASSAULT AS TO PAUL JOHNSON**

148.   Plaintiff repeats and re-alleges the allegations contained in paragraphs 9 through 118 and incorporates the same by reference as though fully set forth herein.

149.   Defendant Paul Johnson unlawfully committed assault and battery upon Plaintiff at the workplace. Paul Johnson, knowingly, intentionally and without Plaintiff's consent touched and made sexual innuendos towards Plaintiff in the manner described above.

## V.   <u>JURY DEMAND</u>

150.   Plaintiff requests that this action be heard before a jury.

34

## VI.   **DAMAGES**

151.   Defendants' conduct constitutes violations of statutory and/or common law. Such unlawful conduct seriously affected Plaintiff in her education and occupation. Because of Defendants' unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer financial loss, humiliation, mental anxiety and stress, physical pain and suffering, and other damages. Plaintiff has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies and procedures of Prairie View University and because of Paul Johnson's unlawful assault. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages in an amount to be proved at trial.

152.   Because of Defendants' unlawful and tortious conduct, it has been necessary for Plaintiff to retain the undersigned attorneys to represent her in these causes of action Plaintiff has agreed to pay her attorney reasonable attorney's fees for the preparation and trial of these causes, and further for any appeal thereof should same become necessary.

153.   Additionally, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve her ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

154.   Further, Plaintiff seeks pre-judgment interest at a rate commensurate

35

with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendants.   Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendants do not promptly tender damages assessed against them and to avoid unjustly enriching Defendants.

## VII.   **PRAYER**

WHEREFORE, premises considered, Plaintiff prays that Defendants be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendants for:

a.      Permanent injunction enjoining Prairie View University, its agents, successors, employees, and those acting in consort with Prairie View from engaging in any practice which discriminates on the basis of gender and protected complaints.

b.      All damages to which Plaintiff may be entitled pursuant to this Amended Complaint, or any further amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

c.      Compensatory damages for pain and mental suffering in the past and future;

d.      Punitive damages as to Paul Johnson for his reckless, malicious and

36

intentional misconduct;

  e.  Reasonable attorney's fees, with conditional awards in the event of appeal;

  f.  Pre-judgment interest at the highest rate permitted by law;

  g.  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

  h.  Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

  i.  Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Amended Complaint or by any amendment hereto.

Respectfully submitted,

The Murphy Law Practice, PLLC

/s/  Marjorie A. Murphy

_____

Marjorie A. Murphy
Attorney-in-Charge
State Bar No. 24013218
S.D. Bar No. 34512
3355 W. Alabama, Ste. 670
Houston, Texas  77098
Telephone:  (832) 564-3804
Facsimile:  (832) 553-7441
Email: marjorie@themurphylawpractice.com
**ATTORNEY FOR PLAINTIFF**

Of Counsel

/s/ *Victoria Plante-Northington*
Victoria Plante-Northington
State Bar No. 00798436
S.D. Bar No. 21235
Plante Law Firm, PC
5177 Richmond Avenue, Suite 1140
Houston, Texas 77056
(713) 526-2615 (Telephone)
(713) 513-5176 (Facsimile)
Email: victoria@plantelawfirm.com
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November 2017, this instrument was filed pursuant to the electronic filing guidelines set forth by the United States District Court for the Southern District of Texas, Houston Division and that service will be further made in compliance with such guidelines.


/s/  Marjorie A. Murphy
Marjorie A. Murphy